**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

LENWOOD HAMILTON,

      Plaintiff,

      v.

LESTER SPEIGHT, EPIC GAMES, INC., MICROSOFT, INC., MICROSOFT STUDIOS, and THE COALITION,

      Defendants.

Civil Action No. 2:17-cv-00169-AB

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL BACKGROUND .............................................................................3

        A.      Hamilton's Football Career...................................................................3

        B.      Hamilton Becomes a Professional Wrestler .........................................4

        C.      Hamilton and Gears of War ..................................................................6

III.    ARGUMENT .....................................................................................................9

        A.      There Are Genuine Disputes of Material Fact......................................9

                1.      Summary Judgment Standard ....................................................9

                2.      Defendants Misappropriated Hamilton's Likeness..................10

                3.      Hamilton's Identity Has Commercial Value.............................15

                4.      Defendants Had Actual Knowledge of Misappropriation ........17

        B.      Hamilton's Claims Are Not Precluded as a Matter of Law .................22

                1.      *Gears of War* Is Not Exempt From Section 8316....................22

                2.      Section 8316 Does Not Subsume Hamilton's Common Law Claims .......24

                3.      Defendants' Misappropriation is Not a Transformative Use...................25

                4.      Hamilton's Common Law Right of Publicity Claim Should Proceed.......29

                6.      Hamilton's Unjust Enrichment Claim Should Proceed ...........32

IV.     CONCLUSION.................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFL Philadelphia LLC v. Krause*,
  639 F. Supp. 2d 512 (E.D. Pa. 2009) ...............................................................24, 31

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................9

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
  25 Cal. 4th 387 (2001) ......................................................................................25, 26

*Commonwealth v. Miller*,
  469 Pa. 24, 364 A.2d 886 (Pa. 1976) .....................................................................24

*Diodato v. Wells Fargo Ins. Servs., USA*,
  44 F. Supp. 3d 541 (M.D. Pa. 2014) .......................................................................15

*Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*,
  442 F.3d 812 (3d Cir. 2006)...............................................................................9, 11

*Educational Testing Servs. v. Katzman*,
  793 F.2d 533 (3d Cir. 1986) ...................................................................................21

*Evans v. Wurkin Stiffs, Inc.*,
  No. 15-61934-CIV, 2016 WL 8793339 (S.D. Fla. Mar. 21, 2016) ........................21

*Facenda v. NFL Films, Inc.*,
  488 F. Supp. 2d 491 (E.D. Pa. 2007), *aff'd in part & vacated in part*, 542 F.3d
  1007 (3d Cir. 2008)...........................................................................................23, 24

*Facenda v. NFL Films, Inc.*,
  542 F.3d 1007 (3d Cir. 2008)..................................................................................25

*Fanelle v. LoJack Corp.*,
  C.A. No. 99-4292, 2000 WL 1801270 (E.D. Pa. Dec. 7, 2000) ........................30, 32

*Gabriel v. Giant Eagle, Inc.*,
  124 F. Supp. 3d 550 (W.D. Pa. 2015).....................................................................32

*Gravano v. Take-Two Interactive Software, Inc.*,
  31 N.Y.3d 988 (2018)..............................................................................................29

*Haelan Labs., Inc. v. Topps Chewing Gum, Inc.*,
  202 F.2d 866 (2d Cir. 1953)....................................................................................26

i

*Harris v. Bell*,
  250 F. 209 (8th Cir. 1918), *aff'd*, 254 U.S. 103 (1920) ........................................22

*Hart v. Elec. Arts, Inc.*,
  717 F.3d 141 (3d Cir. 2013)........................................................... *passim*

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010) ..............................................................26, 29

*Jahn v. O'Neill*,
  327 Pa. Super. 357, 475 A.2d 837 (Pa. Super. 1984) ............................................24

*Kirby v. Sega of Am., Inc.*,
  144 Cal. App. 4th 47, 51 (Cal. Ct. App. 2006) ......................................11, 12, 27, 28

*Lewis v. Marriott Int'l, Inc.*,
  527 F. Supp. 2d 422 (E.D. Pa. 2007) ....................................................24, 30

*Limbach Co., LLC v. City of Philadelphia*,
  905 A.2d 567 (Pa. Commw. Ct. 2006) ......................................................32

*Lohan v. Take-Two Interactive Software, Inc.*,
  31 N.Y.3d 111 (2018) ................................................................29

*Majorsky v. Douglas*,
  58 A.3d 1250 (Pa. Super. Ct. 2012)........................................................17, 24

*McFarland v. Miller*,
  14 F.3d 912 (3d Cir. 1994)..............................................................25

*Midler v. Fort Motor Co.*,
  849 F.2d 460 (9th Cir. 1988) ............................................................13

*Mitchell v. Cartoon Network, Inc.*,
  No. 15-5668, 2015 WL 12839135 (D.N.J. Nov. 20, 2015) ..............................29, 30

*Motschenbacher v. R. J. Reynolds Tobacco Co.*,
  498 F.2d 821 (9th Cir. 1974) ......................................................10, 13, 16

*Newcombe v. Adolf Coors Co.*,
  157 F.3d 686 (9th Cir. 1998) ............................................................15

*No Doubt v. Activision Publishing, Inc.*,
  192 Cal. App. 4th 1018 (Cal. Ct. App. 2011) ......................................26, 27, 29

*Palmer v. Schonhorn Enters., Inc.*,
  96 N.J. Super. 72 (N.J. Super. Ct. Ch. Div. 1967) ....................................16

*Rose v. Triple Crown Nutrition, Inc.,*
    No. 4:07-CV-00056, 2007 WL 707348 (M.D. Pa. Mar. 2, 2007) ...........................................30

*Seale v. Gramercy Pictures,*
    949 F. Supp. 331 (E.D. Pa. 1996) ....................................................................................30, 31

*Smith v. Pittsburgh Gage & Supply Co.,*
    464 F.2d 870 (3d Cir. 1972)...............................................................................................9, 16

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris,*
    171 F.3d 912 (3d Cir. 1999)....................................................................................................32

*Three Boys Music Corp. v. Bolton,*
    212 F.3d 477 (9th Cir. 2000) ..................................................................................................21

*Tillery v. Leonard & Sciolla, LLP,*
    521 F. Supp. 2d 346 (E.D. Pa. 2007) ...............................................................15, 16, 17, 31

*Universal Athletic Sales Co. v. Salked,*
    511 F.2d 904 (3d Cir. 1975)....................................................................................................21

*Washington v. Brown & Williamson Tobacco Corp.,*
    C.A. No. 82-0776, 1984 WL 63629 (E.D. Pa. Apr. 27, 1984) ...............................................18

*Washington v. Take-Two Interactive Software, Inc.,*
    No. B232929, 2012 WL 5358709 (Cal. Ct. App. Oct. 31, 2012) ...........................................29

*Wendt v. Host Int'l,*
    125 F.3d 806 (9th Cir. 1997) ..................................................................................................15

*White v. Samsung Elecs. Am., Inc.,*
    971 F.2d 1395 (9th Cir. 1992) ..........................................................................................10, 15

*Winter v. DC Comics,*
    30 Cal. 4th 881 (Cal. 2003)....................................................................................................26

*Wizkids Creations Co. v. SEPTA Transp.,*
    C.A. No. 02-3249, 2003 WL 21250661 (E.D. Pa. Feb. 27, 2003)....................................21, 22

**Statutes**

42 Pa.C.S.A. § 8316............................................................................................... *passim*

**Federal Rules**

Fed. R. Civ. P. 56(a) ..................................................................................................................9

**Other Authorities**

10A C. Wright, A. Miller & M. Kane, *Fed. Prac. & Proc.* § 2730 (1983) ...................................18

NCAA Research, *Estimated Probability of Competing in College Athletics* (Apr. 20, 2018), http://www.ncaa.org/sites/default/files/2018RES_2017- 18ProbabilityofGoPro_20180423.pdf; .................................................................................16

Restatement (Third) of Unfair Competition § 46 ......................................................................31

## I.   INTRODUCTION

Defendants Microsoft Inc., Microsoft Studios, The Coalition, Epic Games, Inc., and Lester Speight (collectively, "Defendants") are the makers[1] of some of the most commercially successful video game franchises in history, including *Halo*, *Forza*, *Fortnite*, and, relevant to this case, *Gears of War*.[2]  Their motion for summary judgment seeks to abolish all right of publicity claims under Pennsylvania law for any video game.  They are also asking this Court to find that the medium of video games is immune from nearly all right of publicity claims.

First, Defendants argue that video games are exempt under Pennsylvania's right of publicity statute, 42 Pa.C.S.A. § 8316.  (Defendants' Memorandum of Law In Support of Their Moton for Summary Judgment ("Br.") at 25.)  They further argue that this statute subsumes Pennsylvania's common law right of publicity.  (Br. at 27.)  The logical conclusion of Defendants' position is that the right of publicity would cease to exist under Pennsylvania law as it pertains to all video games.  Defendants have no basis to carve out their particular entertainment medium from this statute.

Second, Defendants put forth a Transformative Use Test as a defense that would excuse even the most blatant misappropriation.  According to them, the misappropriation of someone's likeness by a video game developer is only actionable when the stars align: where players can "be" the celebrity at issue, where they engage in the same activities that make the celebrity famous, and inhabit a realistic depiction of our planet.  (Br. at 17.)  Thus, Defendants want to be able to pluck somebody's identity from the real world, put it in their virtual world with different clothing, and then duck and cover behind the First Amendment.  And even worse, put a virtual

---

[1] With the likely exception of Mr. Speight.

[2] Unless otherwise indicated, "*Gears of War*" as stated herein refers to the video game series of the same name as a whole, as opposed to any individual game within the series.

machine gun with a chainsaw bayonet in that person's hands against their will.  They have asked this Court to issue a license to steal by requesting summary judgment here.

Avoiding an absurd result is not the only reason this Court should deny Defendants' motion: there is still the issue of misappropriation.  Plaintiff Lenwood Hamilton ("Plaintiff" or "Hamilton") is a former professional football player and wrestler who had his identity taken without his permission in the form of the Augustus Cole (a.k.a. "Cole Train") ("Cole") character in the *Gears of War* video games.  Indeed, there is more than sufficient evidence which would indicate to a reasonable juror that the similarities between Cole and Hamilton could not have been created by coincidence: the two share the same face, race, voice, hair style, skin tone, physique, professional athletic background, and even distinctive outfits.[3]

Defendants argue that summary judgment is appropriate because many people share these individual traits, or that any similarities between Hamilton and Cole are coincidental.[4]  But Hamilton is not asserting that Cole only shares his voice.  Or his eyebrows.  Or his race.  Or his skin tone.  Cole represents a wholesale lifting of Hamilton's *combination* of traits which makes Hamilton a unique individual and made his professional wrestling persona a local icon.  This theft is further underscored by the fact that Lester Speight, who provides the voice for Cole in *Gears of War*, knew Hamilton and wrestled with him.  Speight is the smoking gun in this case.  Indeed, it is undisputed that elements of Cole were changed *after* Speight was brought on to provide his voice.  In sum, one can trace a direct line from Hamilton, to Speight, and ultimately to Cole.

---

[3] At trial, Mr. Hamilton will testify that many people have stopped him unprompted and have opined that he looks and sounds exactly like Cole.

[4] Coincidence cannot explain how, of all the actors in the United States, Defendants selected the one person to voice Cole who had previously worked with Hamilton and therefore knew him extensively.  This fact alone is sufficient to get to a jury.

Finally, Hamilton has presented sufficient factual evidence to support the other elements of his right of publicity claims.  With regard to the "commercial value" element, Hamilton's identity clearly has commercial value: he is a former NFL player and professional wrestler who has been the subject of media coverage and has been recognized by the City of Philadelphia in his work to benefit underprivileged children.  Even still, under Pennsylvania's common law right of publicity, commercial value is presumed if one's identity has been taken.  With regard to the "actual knowledge" element, it is undisputed that Speight was already familiar with Hamilton prior to joining the *Gears of War* voice cast, and the striking similarities between Cole and Hamilton are such that a juror could reasonably infer that this could not have been the product of coincidence, but of a wholesale knowledge of Hamilton.

## II.   FACTUAL BACKGROUND

### A.   Hamilton's Football Career

Plaintiff Hamilton is an African American male who grew up in Pennsylvania, where he played high school football at Wilson High School in Easton, Pennsylvania in the 1970's.  Statement of Disputed Material Facts ("SDMF"), Ex. 1, ¶ 5.  He was a star athlete who went on to play football at elite NCAA Division I schools, including North Carolina State from 1978 to 1980 and Southern University from 1981 to 1982.  *Id.*, ¶ 6.  He possessed such talent that he was recruited by NFL teams, including the Pittsburgh Steelers.  *Id.*, ¶ 7.  Unfortunately, an incident occurred in 1982 where Hamilton was *falsely* accused of rape.  In 1983, he was sent to Orleans Parish Prison.  Hamilton's name was eventually cleared when it was discovered that one of the prosecution's witnesses lied during trial.  However, this was not before Hamilton spent more than four months in prison for a crime he did not commit.  *Id.*, ¶ 8.

Needless to say, this decimated a very promising athletic career.  However, Hamilton's talent and notoriety were such that he still fielded interest from several professional teams,

including from the NFL, USFL, and CFL. *Id*., ¶ 9. In 1983-84, Hamilton tried out for the Philadelphia Eagles but did not make the team. *Id*., ¶ 10. Still, the Philadelphia Inquirer published a feature story on Hamilton on July 18, 1984, which described his rough upbringing along with significant turning points in his life, including the *false* rape allegation and acquittal. SDMF, Ex. 23. He would eventually play for the Philadelphia Eagles during the strike-shortened 1987 season, which marked the end of his professional football career. Defendants' Statement of Undisputed Material Facts ("DSUMF"), ¶ 49.

### B. Hamilton Becomes a Professional Wrestler

In 1988, Hamilton became a professional wrestler, where he performed in bouts throughout the world. SDMF, Ex. 1, ¶ 11. In the 1990s, Hamilton developed his own professional wrestling organization called Soul City Wrestling. DSUMF, ¶ 52. Hamilton wanted Soul City Wrestling to be family-friendly entertainment. SDMF, Ex. 1, ¶ 12. Hamilton is against wanton violence, and indeed, became a motivational speaker to inspire and motivate disadvantaged children and youths, particularly those in underprivileged minority communities in the Philadelphia area. *Id*., ¶ 13.

Beginning in 1997, Soul City Wrestling promoted and held professional wrestling bouts at several venues in and around Philadelphia, and in other cities. *Id*., ¶ 14. As a wrestler, Hamilton was known as "Hard Rock" Hamilton, who was often featured as the main event and was the "Soul City Heavyweight Champion of the World." *Id*., ¶ 15. Hamilton appeared in a number of television interviews to promote Soul City Wrestling, including a 1999 feature story on WPVI-TV and on shows hosted by Wally Kennedy and Morton Downey, Jr. *Id*., ¶ 16. Hamilton used this platform not only to promote Soul City but also to spread his message to kids about drug awareness and the importance of an education. *Id*. Hamilton, Soul City Wrestling, and their family-friendly mission were also the subject of a number of newspaper articles,

4

including the Philadelphia Inquirer, Philadelphia Sunday Sun, Philadelphia Daily News, and

Norristown Times Herald.  *Id.*  Even then-Mayor of Philadelphia Edward G. Rendell was

supportive of this, writing Hamilton a supportive letter acknowledging his efforts to help and

mentor disadvantaged minority children.  SDMF, Ex. 21.

As a professional wrestler, Hamilton donned a unique look and persona.  An image of

Hamilton as "Hard Rock Hamilton" is below:



*Id.*, ¶ 4.

In 1998, Defendant Lester Speight ("Speight") joined Soul City Wrestling, where he

donned the wrestling persona "Rasta the Urban Warrior."  SDMF, Ex. 1, ¶ 17.  Hamilton and

Speight wrestled together and were even considered potential tag-team partners.  *Id.*  On July 25,

1998, Soul City Wrestling sponsored a wrestling event at Viking Hall in Philadelphia which featured Hamilton as "Hard Rock Hamilton" and Speight as "Rasta the Urban Warrior."  *Id.*, ¶ 18.  During the after-party for that event, Speight discussed plans for a violent, "shoot 'em up"-type video game with Hamilton.  *Id.*  True to his family-friendly ethos, Hamilton informed Speight that he was not interested in taking part in a violent video game.  *Id.*

### C.     Hamilton and Gears of War

The first *Gears of War* game was released in 2006.  DSUMF, ¶ 25.  Development for the game began at least as far back as 2000.  DSUMF, ¶ 1.  The fictional plot of the video game series takes place solely on an Earth-like planet called Sera and involves a conflict between humanity and a race known as the Locust Horde.  *See* SDMF, Ex. 19, at 1.  The series primarily follows a military unit called Delta Squad, which consists of the fictional characters Marcus Fenix, Dominic Santiago, Damon Baird, and Augustus "Cole Train" Cole.  DSUMF at ¶ 2.  While the in-game appearance for the characters are three-dimensional computer-generated images, their voices are provided by actors.  Throughout the *Gears of War* series, Speight, Hamilton's former wrestling mate, serves as the voice actor for Cole.  DSUMF, ¶ 16.

Up until shortly before this litigation commenced, Hamilton was largely unfamiliar with *Gears of War*.  SDMF, Ex. 1, ¶ 19; SDMF, Ex. 22 at 19:4-10.   On the other hand, Hamilton's son, David Hamilton ("David"), along with David's friends, were avid *Gears of War* players.  *Id*.  When playing these games, they referred to Cole as "Mr. Hamilton" because of what they viewed as a striking resemblance between Cole and Hamilton.  SDMF, ¶ 15.

In or around January 2015, Hamilton finally saw what his son and son's friends had seen: that the Cole character in *Gears of War* bore a striking resemblance to Hamilton.  Looking at

Cole on the screen was like looking in a mirror for Hamilton.  SDMF, Ex. 1, ¶ 20.  Both

Hamilton and Cole are African American men with the same facial features and skin tone; Cole's

voice sounds like Hamilton's; Cole's way of speaking sounds like Hamilton's professional

wresting persona; Cole's hair looks like Hamilton's; Cole's physique looks like Hamilton's; Cole

dons outfits that resemble Hamilton's wrestling outfits.  *See* SDMF, ¶¶ 17-19.  Cole even shares

the same background as Hamilton, including striking similarities in their football careers.[5]

SDMF, Ex. 20 at 30:5-13; *id.*, ¶¶ 12, 20.

Simply seeing pictures of Cole's and Hamilton's faces side-by-side shows the striking

similarity between the faces:



SDMF, ¶ 17.

---

[5] In *Gears of War*, Cole plays a sport known as "thrashball," which is merely a renamed version of real-world
football.  SMDF, ¶ 12.

Hamilton played football for the Philadelphia Eagles.  *See supra* Part II.A.  Cole played

thrashball (i.e., football in our universe) for the Eagles.  Below are images of the two in their

sporting gear:

 

SDMF, ¶ 20.

In-game, Cole dons several outfits that resemble "Hard Rock" Hamilton, as seen below:

 

SDMF, ¶ 19.

Cole is unmistakably the embodiment of Hamilton within *Gears of War.*

## III.   ARGUMENT

### A.  There Are Genuine Disputes of Material Fact

#### 1.      Summary Judgment Standard

Summary judgment is only appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[S]ummary judgment will not lie if the dispute about a material fact is

'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In resolving this,

the court must view the evidence in the light most favorable to the nonmoving party by resolving

all inferences, doubt, and issues of credibility in favor of the nonmoving party.  *Smith v.*

*Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972); *Doeblers' Pennsylvania*

*Hybrids, Inc. v. Doebler*, 442 F.3d 812, 819-20 (3d Cir. 2006).

### 2.    Defendants Misappropriated Hamilton's Likeness

The courts are abundantly clear that the question of whether a defendant has misappropriated an individual's identity is a question of fact for the jury to determine.  In *White v. Samsung Elecs. Am., Inc.*, Vanna White, the hostess of the *Wheel of Fortune* game show, alleged that a robot in a Samsung advertisement violated her right of publicity.  971 F.2d 1395, 1396 (9th Cir. 1992).  The robot looked nothing like White and, indeed, was clearly not even human:[6]



Despite this, the court found that the combination of elements, including the robot's wig, gown, jewelry, and pose next to a game board that was "instantly recognizable" as the *Wheel of Fortune* set, precluded a finding of summary judgment against her.  *Id.* at 1396, 1399.

Similarly, in *Motschenbacher v. R. J. Reynolds Tobacco Co.*, the court found that summary judgment on a right of publicity claim was inappropriate where the infringing

---

[6] Image source: https://www.smithsonianmag.com/history/robot-vanna-trashy-presidents-and-steak-as-health-food-samsung-sells-tomorrow-22348926.

commercial did not even show the plaintiff's face.  498 F.2d 821, 822 (9th Cir. 1974).  There, the

plaintiff was a race car driver who consistently "individualized" his cars to make them unique.

*Id.*  The accused advertisement not only failed to show plaintiff's face, but also made a number

of changes to set the pictured car apart from plaintiff's cars.  *Id.*  However, enough elements

remained, including "the white pinstriping, the oval medallion, and the red color of plaintiff's

car," that would make viewers identify the car in question with the plaintiff and render summary

judgment inappropriate.  *Id.* at 822, 827.

Finally, in *Kirby v. Sega of America, Inc.*, a musician named Kierin Kirby alleged that the

makers of the video game *Space Channel 5* misappropriated her right of publicity with the

inclusion of a character called "Ulala" in the game.  144 Cal. App. 4th 47, 51 (Cal. Ct. App.

2006).  The trial court found that there were significant differences between Ulala and Kirby.  *Id.*

at 56 (in addition to differences in outfit, Ulala donned futuristic accessories such as a ray-gun

and jetpack while "Kirby's fashion approach harkens back to a retro 1960s style" and did not

relate to outer space).  Ulala can be seen below:[7]

---

[7] Image source: https://www.mobygames.com/game/space-channel-5/promo/promoImageId,22877.



Notwithstanding these, the trial court found, and the appellate court agreed, that certain

similarities in facial features, catch phrases, and clothing and hair styles gave rise to a factual

issue on misappropriation.  *Id.* at 56-57.

      Here, Hamilton has proffered a plethora of evidence showing the similarities between

himself and Cole, including voice, face, race, hair, skin tone, physique, outfits, and background.

*See supra* Part II.C.  Defendants resort to arguing that any similarities between the two are also

shared features among many other people.  (*See* Br. at 20.)  Hamilton rejects Defendants'

invitation to accept the falsehood that all physically fit black men are the same.  The

determination of whether there has been misappropriation requires a consideration of

particularities, including significant differences among the nation's large demographic of African

American men.

First, regarding physical attributes, Hamilton's facial recognition expert has testified that Hamilton's likeness is that of Cole.  SMDF, Ex. 9, Expert Report of Dr. Behnam Bavarian ("Bavarian Report") at 2-3.  Many other people who have seen both Hamilton and Cole have also testified that the two look alike in the face and hair.  SMDF, ¶ 17; *see Midler v. Fort Motor Co.*, 849 F.2d 460, 461-62 (9th Cir. 1988) (court crediting evidence where Bette Midler was told by "a number of people," including her manager's friends, that they thought Midler sang a commercial); *Motschenbacher*, 498 F.2d at 422 ("Several of plaintiff's affiants who had seen the commercial on television had immediately recognized plaintiff's car and had inferred that it was sponsored by Winston cigarettes.").

Second, another striking similarity here is that Cole and Hamilton's voices are virtually identical.  Hamilton's voice expert has testified that the two voices are so alike as to be virtually identical.  SDMF, Ex. 8, Expert Report of Edward J. Primeau, CCI, CFC ("Primeau Report") at 8.  Meanwhile, Defendants have not proffered any expert opinion on whether or not the two voices are alike.  Many others who have heard the two also testified that they sound the same. SDMF, ¶ 18.  Since it is undisputed that Speight provided Cole's voice, (DSMUF, ¶ 16) this leads to the inescapable conclusion that Speight was imitating Hamilton's voice when performed Cole's voice.

Third, Defendants took Hamilton's race.

Fourth, Defendants took Hamilton's ebony skin tone.  SDMF at ¶¶ 15, 17.  Given the range of skin tones within the African American community, the fact that Hamilton and Cole share the same skin tone is significant when one realizes the myriad number of options.

Fifth, Hamilton's body type matches that of Cole. SDMF, ¶ 17.  Again, with a wide range of fit bodies to use, Defendants elected to take Hamilton's muscular build and large, sculpted

arms.

While the confluence of physical features is sufficient to distinguish the instant case from all of Defendants' supporting cases, the similarities between Cole and Hamilton do not end there.

Sixth, Hamilton and Cole share the same background. Hamilton played football for the Philadelphia Eagles. SDMF, ¶ 1. Cole played thrashball—football in all but name—for the Eagles. SDMF, ¶¶ 12, 20.

Seventh, Defendants took Hamilton's distinctive "Hard Rock Hamilton" outfit in the form of the "Superstar Cole" outfit. SDMF, ¶ 19. Like particular shades of African American skin tone, and the many kinds of body types, there are thousands of ways to wear an outfit that consists of a cut-off t-shirt. But a sleeveless shirt worn in combination with Chippendale style arm adornments, especially when combined with a distinctive patrician-style hat is a telling theft—how many soldiers wear such an outfit while fighting?

The Gears of War games place Hamilton's likeness into a virtual world very much like Hamilton's own. The character, Cole, is placed in the violent city streets—much like the streets that Hamilton grew up on—of an earth-like planet. SDMF at ¶ 9. Hamilton grew up in Pennsylvania while Cole's virtual hometown has the very Earth-like name of Hanover—like the Pennsylvania town.

All of the other attributes of the Cole character, his job as a soldier, his soldier's uniform, and his missions killing aliens, are a result of the topic of the game as a whole and is true of all of the other playable characters in the game. A reasonable jury can find that all of the distinctive elements specific to the Cole character, the elements that made him a distinct, memorable, and interesting character, were lifted from Hamilton's likeness.

It is the combination of specific thefts by Defendants, when viewed in a light most

14

favorable for Hamilton, demonstrates that the Cole character is a wholesale imitation of

Hamilton.  As the court in *White* explained:

> Viewed separately, the individual aspects of the advertisement in the
> present case say little.  Viewed together, they leave little doubt about the
> celebrity the ad is meant to depict.  The female-shaped robot is wearing a
> long gown, blond wig, and large jewelry.  Vanna White dresses exactly
> like this at times, but so do many other women.  The robot is in the
> process of turning a block letter on a game-board.  Vanna White dresses
> like this while turning letters on a game-board but perhaps similarly-
> attired Scrabble-playing women do this as well.  The robot is standing on
> what looks to be the Wheel of Fortune game show set.  Vanna White
> dresses like this, turns letters, and does this on the Wheel of Fortune game
> show.  She is the only one.  Indeed, defendants themselves referred to their
> ad as the "Vanna White" ad.  We are not surprised.

971 F.2d at 1399.  The jury should be able to evaluate the evidence, not merely as individual

thefts, but, importantly, as a collective whole which can only point to the confirmation of

Hamilton's claims.  In fact, these are the very types of factual determinations uniquely fit for a

jury.  *See Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692-93 (9th Cir. 1998) (genuine issue of

material fact whether plaintiff was readily identifiable in accused photograph); *Wendt v. Host

Int'l*, 125 F.3d 806, 810-12 (9th Cir. 1997) (genuine issue of material fact whether robots utilized

plaintiffs' likenesses).

### 3.    Hamilton's Identity Has Commercial Value

Section 8316 defines "commercial value" as "[v]aluable interest in a natural person's

name or likeness that is developed through the investment of time, effort and money."  42

Pa.C.S.A. § 8316(e).  Courts in this Circuit have consistently concluded that "[t]he determination

of whether plaintiffs [sic] name has commercial value" is a "factual determination[] not really

appropriate for summary judgment."  *Tillery v. Leonard & Sciolla, LLP*, 521 F. Supp. 2d 346,

351 (E.D. Pa. 2007); *see also Diodato v. Wells Fargo Ins. Servs., USA*, 44 F. Supp. 3d 541, 572

n.19 (M.D. Pa. 2014) ("Commercial value inquiries are typically fact-intensive and ill-suited for

summary judgment.") (citing *Tillery*, F. Supp. 2d at 351). This Court must infer indications of commercial value in the light most favorable to the nonmoving party on summary judgment. *Smith*, 464 F.2d at 874.

Hamilton has adduced significant evidence towards the issue of commercial value. He was a star college football player on elite NCAA Division I teams and played professionally, including in the NFL for the Philadelphia Eagles. *See supra* Part II.A. Clearly, athletes' identities have commercial value. *See Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 145-46 (3d Cir. 2013) (college football player); *Motschenbacher*, 498 F.2d at 822 (race car driver); *Palmer v. Schonhorn Enterprises, Inc.*, 96 N.J. Super. 72, 74, 79 (N.J. Super. Ct. Ch. Div. 1967) (professional golfers); SDMF, Ex. 18, Deposition of Barbara Carole Luna, Ph.D. ("Luna Dep.") at 215:3-19. Indeed, the odds of even making it into professional football are astronomically low[8]; Mr. Hamilton is in the 99th percentile of football players in the United States.

Hamilton's commercial value is further evidenced by his professional wrestling career, where he was the main event for many wrestling bouts. *See supra* Part II.B. And Hamilton's remarkable life story has been captured in the media—on television and print—on numerous instances, from his professional football career, to his wrongful imprisonment and acquittal, to his efforts to use his wrestling organization as a force to enact positive change in underprivileged children. *See id.* Indeed, Hamilton was recognized by Philadelphia city officials—including the mayor—for his efforts. *See id.*

Lastly, Hamilton's damages expert has testified that his identity has commercial value. *See* SDMF, Ex. 17, Luna Report at 11. His identity and likeness are also worth a great amount in

---

[8] Only a small fraction of high school football players ever make the NCAA college level (6.9%), and an even smaller fraction of those make it to the NFL (1.6% of the 6.9%). *See* NCAA Research, *Estimated Probability of Competing in College Athletics*, (Apr. 20, 2018), http://www.ncaa.org/sites/default/files/2018RES_2017-18ProbabilityofGoPro_20180423.pdf; *see also* SDMF, Ex. 18, Luna Dep. at 215:3-19.

a reasonable royalty. *Id.* at 2.

All the above, viewed in the light most favorable to Hamilton, evidences a "valuable interest" in Hamilton's name or likeness that he "developed through the investment of time, effort and money." 42 Pa.C.S.A. § 8316(e). On the other hand, Defendants fail to present any uncontroverted evidence that Plaintiff's identity has no value. For example, they have not proffered an expert on measuring the commercial value of Hamilton's name or likeness. At minimum, whether all of this rises to the requisite level of "valuable interest" is a question of fact more appropriately decided by a jury. *See Tillery*, F. Supp. 2d at 351.

Defendants' reliance on *Majorsky v. Douglas* is misplaced. (Br. At 27 (citing *Majorsky*, 58 A.3d 1250, 1263 (Pa. Super. Ct. 2012)).) That case involved a determination of whether enough had been invested in a person's given name in a particular industry such that it achieved secondary meaning within that industry. *Majorsky*, 58 A.3d at 1263. No person's given name is at issue here. To the extent Hamilton's professional wrestling company and persona are at issue, they have their own distinct names and meaning to the public complete with advertisements and public appearances.

### 4.      Defendants Had Actual Knowledge of Misappropriation

Defendants contend that actual knowledge is a requisite element of a section 8316 claim, which Hamilton has purportedly failed to adduce evidence of. (Br. at 25-26.) In support, Defendants point to the self-serving deposition testimony of their own witnesses to demonstrate that the Microsoft and Epic defendants had never heard of Hamilton prior to this lawsuit. (*Id.* at 25.) They likewise turn to their own testimony to support their assertion "that Speight had no input into the appearance of the Cole Character" and therefore "he cannot be held liable for any alleged similarities in Hamilton's appearance." (Br. at 25-26.) The jury is entitled to disbelieve this testimony given the number of similarities between the character Cole and Mr. Hamilton.

Hamilton's lack of *direct* evidence which speaks to Defendants' state of mind—their actual knowledge—is not an absolute bar to Hamilton's right of publicity claim even under section 8316. Finally, Defendants did know about Hamilton and his professional wrestling career through Mr. Speight.

*Washington v. Brown & Williamson Tobacco Corp.* is illustrative. There, plaintiff Grover Washington, Jr. alleged that defendants violated his right of publicity by using his likeness without authorization in a series of cigarette ads. C.A. No. 82-0776, 1984 WL 63629, at *1-2 (E.D. Pa. Apr. 27, 1984). In support of their summary judgment motion, the defendants contended that Washington's right of publicity claim failed as a matter of law because the proffered deposition testimony of defendants' own witnesses indicated that they had never seen Washington or his photograph prior to developing the ads at issue. *Id.* at *2. Lacking any knowledge of Washington's appearance, defendants could not have had any intent to use his likeness in their ads. *See id.* However, the *Washington* court went on to acknowledge that "information relating to an individual's state of mind is generally within that person's exclusive knowledge." *Id.* (citing 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2730 (1983)). Bearing this in mind, that court pointed to circumstantial evidence that defendants intended (and thus knew) of Washington's likeness:

> Specifically, plaintiff points to his solicitation by agents of Brown & Williamson to perform in the Kool Jazz Festival, an alleged pattern of displaying the disputed advertisement in cities in which plaintiff performed during the summer of 1982, and the use of Milt Jackson, another renowned jazz musician, as a model for the advertising campaign, as well as a host of other relatively minor factual issues. However speculative they may be, the inferences to be drawn from such facts are not questions for the court to resolve. The task of making factual inferences must be done by the jury. Moreover, because the issue of intent is a material fact, the jury must be given an opportunity to observe the demeanor of Vail, Dearth, and Lewis to evaluate the credibility of each. *See* Advisory Comm. Noted Fed. R. Civ. P. 56(e).

18

*Washington*, 1984 WL 63629, at *2.

Here, too, what Defendants actually knew is generally within their exclusive knowledge. Like in *Washington*, there is ample evidence in the record by which a reasonable juror can infer that Defendants actually knew of their misappropriation.  As an initial matter, Speight's testimony is inconsistent with itself.  Speight testified that he had no input into the Cole character.  SMDF, Ex. 13 at 44:11-13.  Yet, he also testified that he tested different voices for Cole and suggested changes to the character's voice and that Cole's appearance morphed over time.  *Id.* at 32:9 – 33:4; 44:14 – 45:2.  Both of these statements cannot be true.  Thus, which part of his testimony to be believed is a credibility determination for the jury.  What we do know, however, is that Hamilton's expert analyzed voice samples from the *Gears of War* games with voice samples obtained from Hamilton and concluded that they were so similar as to likely have come from the same person.  SDMF Ex. 8, Primeau Report at 8; *see also* SDMF, ¶ 18.  Since Speight and Hamilton wrestled together, *see supra* Part II.B, a reasonable juror can infer that Speight modeled Cole's voice after one he was exceedingly familiar with: Hamilton's.

Additionally, Defendants cannot credibly claim that Speight had no input into Cole's appearance when it is undisputed that Cole's appearance *was changed* after the *Gears of War* developers met Speight.  Ex. 13 at 65:20 – 66:6.  And Defendants' contention that Speight was hired only after Cole's appearance was developed is only plausible with respect to the first *Gears of War* game.  This game was released in 2006, but *Gears of War 2*, *Gears of War 3*, *Gears of War: Judgment*, and *Gears of War 4* were released in 2008, 2011, 2013, and 2016, respectively.[9]

This is not a case where there is no connection between the plaintiff and any of the defendants and any instances of misappropriation might easily be explained as mere

---

[9] There are also unreleased *Gears of War* games, spinoffs, and remastered editions.

happenstance.  Rather, there is very direct connection: Hamilton and Speight wrestled together not long before the first *Gears of War* game began development.  *See supra* Part II.B.  This connection is further buttressed when one compares the "Superstar Cole" outfit together with the "Hard Rock Hamilton" outfit:





*See supra* Part II.C.  Somehow, a wrestler-turned-voice actor (Speight) contributes to a character (Cole) that happens to don a very unique look distinctive to that wrestler-turned-voice actor's former wrestling companion (Hamilton).  Whether this is all just one big coincidence, or whether that wrestler-turned-voice actor brought over an identity he was familiar with to the team (Epic)[10] developing a character for a video game is a question of fact that should go to the jury.

That Defendants had actual knowledge of their misappropriation is further buttressed by the striking similarity between Cole and Hamilton.  *See supra* Part III.A.2.  The incredible overlap of voice, face, hair, race, skin tone, outfit, accoutrements, and even background between Cole and Hamilton can lead a reasonable juror to conclude that it was extremely unlikely to have

---

[10] Defendant Epic developed the *Gears of War* games until 2014, when it sold the rights to the Microsoft Defendants.  DSUMF, ¶ 38.

occurred through happenstance.  The inference to be drawn, therefore, is that Defendants must

have had access and actual knowledge of Hamilton and the resulting misappropriation.

There is ample support for such an inference in a related area of intellectual property law:

copyright.[11]  An element of copyright infringement is copying of the protected work.  *Wizkids*

*Creations Co. v. SEPTA Transp.*, C.A. No. 02-3249, 2003 WL 21250661, at *3 (E.D. Pa. Feb.

27, 2003).  However, "[b]ecause it is rare that direct evidence of copying will exist, copying may

be proven by showing (1) that the defendant had access to the work from which to copy and (2)

substantial similarity between the two works."  *Id.* at *4 (citations omitted).  Access, in turn,

"may be inferred by proof of 'striking similarity.'"  *Id.* (citing *Educational Testing Servs. v.*

*Katzman*, 793 F.2d 533, 541 (3d Cir. 1986)); *see also Universal Athletic Sales Co. v. Salked*, 511

F.2d 904, 907 (3d Cir. 1975) (determining whether two works are substantially similar is an

approved way "to establish the facts of copying and of access to the copyrighted material where

such proof is otherwise lacking"); *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir.

2000) ("in the absence of any proof of access, a copyright plaintiff can still make out a case of

infringement by showing that the songs were 'strikingly similar'") (citations omitted).  Because

an element of copyright infringement (access) can be inferred from a showing of a great deal of

similarity between the protected work and the infringing work, it would be logical to also

conclude that an element of misappropriation of the right of publicity (actual knowledge) can be

inferred from a showing of a great deal of similarity between the protected interest and the

alleged misappropriation.

Defendants' citation to *Evans v. Wurkin Stiffs, Inc.* is unavailing.  (*See* Br. at 26.)  The

---

[11] This is particularly apt where, as here, the Third Circuit adopted another concept from copyright law into right of publicity law: the Transformative Use Test.  *See Hart*, 717 F.3d at 158.

*Evans* court did hold that plaintiff failed to allege sufficient facts which gave rise to a reasonable inference that the defendants knew or had reason to know that they infringed plaintiff's rights. No. 15-61934-CIV, 2016 WL 8793339, at *8 (S.D. Fla. Mar. 21, 2016).  But this is because all that the plaintiff in that case alleged in the complaint was that defendants "acted with knowledge" that they would violate plaintiff's rights.  *Id.* at *7-8.  The court observed that this was "nothing more than a legal conclusion about the Defendants' state of mind."  *Id.* at 7.  As shown above, there is much more evidence in the record in this case, as well as inferences that can reasonably be drawn from such, than merely spouting that Defendants "acted with knowledge."

### B.  Hamilton's Claims Are Not Precluded as a Matter of Law

#### 1.  *Gears of War* Is Not Exempt From Section 8316

Defendants argue that *Gears of War* is exempt from section 8316 because video games fall under the category of "expressive work," and such works do not fall under the ambit of section 8316.  (*See* Br. at 25; *see also* 42 Pa.C.S.A. § 8316(e) (statute's definition of "commercial or advertising purpose" does not include "expressive work").)  Thus, according to Defendants, Hamilton cannot bring a claim under Pennsylvania's right of publicity statute over misappropriation in video games as a matter of law.  (*See* Br. at 25.)  Yet, at the same time, Defendants argue that section 8316 subsumes Pennsylvania's common law right of publicity causes of action.  (*See* Br. at 27.)  If we follow Defendants' argument to its logical conclusion, this would eviscerate all right of publicity claims involving video games under Pennsylvania law. Defendants' interpretation of section 8316 fails because it leads to an absurd result.  *See, e.g.*, *Harris v. Bell*, 250 F. 209, 217 (8th Cir. 1918), *aff'd*, 254 U.S. 103 (1920) (statutes should have a sensible construction, rather than one that is irrational).  Moreover, Defendants' use of the Cole character outside of the game, in advertisements to sell video games and consoles, is a separate

22

wrong.

A plain reading of the definition of "expressive work" in section 8316 also makes clear that it does not foreclose right of publicity claims in video games. "Expressive work" is defined in the statute as:

> A literary, dramatic, fictional, historical, audiovisual or musical work regardless of the communications medium by which it is exhibited, displayed, performed or transmitted, other than when used or employed for a *commercial or advertising purpose*.

42 Pa.C.S.A. § 8316(e) (emphasis added). If the "expressive work" is used for a *commercial or advertising purpose*, then it enjoys no reprieve under the statute. It is without doubt that *Gears of War* is a work used for a commercial purpose. *See, e.g.*, *Facenda v. NFL Films, Inc.*, 488 F. Supp. 2d 491, 513 (E.D. Pa. 2007), *aff'd in part & vacated in part*, 542 F.3d 1007 (3d Cir. 2008) ("*Facenda I*") (holding that an NFL Films video was commercial in nature under section 8316). The video game series *Gears of War* has made an incredible amount of money. SMDF, Ex. 17, Luna Report at 12. It goes without saying that Defendants, other than Mr. Speight, are for-profit companies worth billions of dollars. Simply put, video game companies make and sell video games to make money.

Defendants' interpretation of "expressive work" is also incorrect because it rests on a faulty premise. They cite *Hart* for the proposition that "video games are protected as expressive speech." (Br. at 25 (citing *Hart*, 717 F.3d at 148) (emphasis added).) But accepting this as true does not necessarily lead to the conclusion that video games are considered *"expressive works" as defined in section 8316*. Indeed, *Hart* does not even address Pennsylvania law, much less section 8316. *See* 717 F.3d at 145 (addressing right of publicity under New Jersey, not Pennsylvania, law). Video games comprise some expressive speech but video games as a whole constitute a commercial entertainment enterprise.

The statute's structure also evidences that absolute immunity from section 8316 for video games was not contemplated by the Pennsylvania legislature. Section 8316(d) is a section entitled "Immunity," which precludes liability under the statute for entities that lacked actual knowledge of the proscribed use. 42 Pa.C.S.A. § 8316(d). If Pennsylvania legislature would have wanted to grant "immunity" to video game uses of name or likeness under section 8316, they would have put it in that section.

Finally, Defendants make no argument that promotional materials in connection with *Gears of War* are exempt from section 8316. That is because they are not. *See* 42 Pa.C.S.A. § 8316(e).

### 2.    Section 8316 Does Not Subsume Hamilton's Common Law Claims

Section 8316 does not subsume Hamilton's common law claims. *Lewis v. Marriott Int'l, Inc.*, 527 F. Supp. 2d 422, 429 (E.D. Pa. 2007). As explained in *Lewis*:

> As a matter of statutory construction, "statutes are not presumed to make changes in the rules and principles of common law or prior existing law beyond what is expressly declared in their provisions." *Commonwealth v. Miller*, 469 Pa. 24, 364 A.2d 886, 887 (Pa. 1976); *Jahn v. O'Neill*, 327 Pa. Super. 357, 475 A.2d 837, 839 (Pa. Super. 1984) (applying same principle in civil case). Marriott points to no indicia in the text of *section 8316* or its legislative history suggesting that it was intended as an exclusive remedy to replace the common-law cause of action of invasion of privacy by misappropriation of identity, and the Court finds none.

*Id.*; *see also AFL Philadelphia LLC v. Krause*, 639 F. Supp. 2d 512, 530 n.6 (E.D. Pa. 2009) (noting that Judge Robreno in *Lewis* concluded that the common law misappropriation of identity tort was not subsumed by section 8316, and similarly finding no caselaw to suggest any subsummation).

As in *Lewis*, Defendants cite to nothing in section 8316 or its legislative history to support their assertion. Their only support is *Facenda I*. (Br. at 27 (citing *Facenda I*, 488 F. Supp. 2d at 513).) But *Lewis* expressly disagrees with *Facenda I*. *Lewis*, 527 F. Supp. 2d at 429.

24

Defendants' assertion that the Third Circuit "appeared to accept [the] result" in *Facenda I* (Br. at 27.) is also unavailing because the Third Circuit did no such thing.  Rather, the issue of whether section 8316 subsumed a common law claim was not on appeal in that case.  *Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1013 n.2 (3d Cir. 2008) ("*Facenda II*").

Finally, section 8316 does not subsume common law right of publicity claims because, if this Court agrees with Defendants that section 8316 exempts video games, doing so would also completely eviscerate right of publicity claims arising from video games under Pennsylvania common law.  This Court must not permit this legislative change.

### 3.     Defendants' Misappropriation is Not a Transformative Use

Not satisfied with eradicating right of publicity claims based on video games in Pennsylvania, Defendants also wield the First Amendment like a sword in order to strip such claims of any force.  Defendants assert that the Transformative Use Test mandates that such claims "survive only in a very narrow, defined, nearly impossible set of circumstances," which is "when players can 'be' the celebrity at issue in a realistic world, engaging in the same activities for which the celebrity is famous."  (Br. at 17.)  This expansive view of the Transformative Use Test is entirely unsupported by the case law, and this Court should not countenance Defendants' brazen effort to steal someone's identity, dress it up consistent with their storyline, and then hide behind the First Amendment's tent.

The right of publicity is undoubtedly a valuable right.  *See Hart*, 717 F.3d at 159 (the right of publicity "offers protection to a form of intellectual property that society deems to have social utility") (citing *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 399 (2001)); *McFarland v. Miller*, 14 F.3d 912, 919 (3d Cir. 1994) ("many prominent persons (especially actors and ball players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for

authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, buses, trains and subways") (quoting *Haelan Labs., Inc. v. Topps Chewing Gum, Inc.,* 202 F.2d 866, 868 (2d Cir. 1953)).  Thus, just because something is considered "expression" does not mean that it receives absolute protection if it encroaches on an individual's right of publicity.  *See Comedy III*, 25 Cal. 4th at 399.

The Third Circuit has sought to balance the valuable interest in an individual's right of publicity against the interests preserved by the First Amendment by applying the Transformative Use Test as a defense to misappropriation.  *Hart*, 717 F.3d at 163-65.  This defense is a question of fact and only available as a matter of law if no trier of fact could conclude that there was no transformative use.  *Hilton v. Hallmark Cards*, 599 F.3d 894, 910 (9th Cir. 2010) (citing *Comedy III*, 25 Cal. 4th at 409).

Prior cases have set forth useful guideposts by which to frame this analysis.  To start, the Third Circuit has acknowledged that *Comedy III* and *Winter v. DC Comics*, 30 Cal. 4th 881 (Cal. 2003), arguably represent opposite ends of the Transformative Use spectrum:

> Where *Comedy III* presents a clear example of a non-transformative use (i.e., mere literal depictions of celebrities recreated in a different medium), *Winters* offers a use that is highly transformative (i.e., fanciful characters, placed amidst a fanciful setting, that draw inspiration from celebrities).

*Hart*, 717 F.3d at 161.

Somewhere in between these two ends of the spectrum lie a series of video game cases. In *Hart*, the Third Circuit found there was no transformative use where not only did the digital avatar in the *NCAA Football* games match a real-world former college football player's hair color, hair style, skin stone, worn accessories, and vital and biographical details, but the avatar also played college football like the real-world player.  *Id.* at 166-67.  Likewise, the court in *No Doubt v. Activision Publishing, Inc.* found that Transformative Use did not form a sufficient

defense to misappropriation by the use of digital recreations of the musical group *No Doubt* in the *Band Hero* video game.  192 Cal. App. 4th 1018, 1034-35 (Cal. Ct. App. 2011).  There, the court found that other expressive elements in the game, such as having the band perform songs in fanciful settings such as outer space or even have the band perform songs they objected to performing, were not sufficiently transformative.  *Id.*

On the other hand, *Kirby* represents a video game case where transformative use was found.  144 Cal. App. 4th at 59-60.  There, the court found that a number of differences between the Ulala character in the accused video game and the real-life Kierin Kirby, taken together, demonstrated that Ulala was transformative.  *Id.* at 59.  Kirby's physical appearance differed from Ulala.  These differences included that Ulala was not a mere likeness or literal depiction of Kirby, but a thinner stylized computer-generated appearance based on a Japanese "anime" style.  *See id.*; *see also supra* p. 12 (image of *Ulala*).  Additional differences included different hairstyles, outfits, dance movements (the accused video game, *Space Channel 5*, was a dancing game), and occupations (Ulala was a space-age reporter in the 25th century, whereas Kirby was a performer).  *Id.*

This case is much more like *Hart* and *No Doubt* than it is like *Kirby*.  Like *No Doubt*, here we are dealing with a computer-generated, literal depiction of Hamilton in the form of the Cole character.  Cole bears Hamilton's resemblance in face, hair style and color, skin tone, physique, voice.  *See supra* Part III.A.2.  Cole also dons a "Superstar Cole" outfit that is substantially similar to Hamilton's "Hard Rock Hamilton" outfit.  *Id.*  Indeed, this is a much stronger physical depiction of Hamilton than the college football player avatar was of the plaintiff in *Hart*, where only the plaintiff's hair color, hair style, skin stone, and worn accessories were depicted.  *See Hart*, 717 F.3d at 166-67.  And the striking similarities between Cole and

27

Hamilton serve to underscore the differences between the instant case and *Kirby*, where the accused avatar—in addition to the numerous physical appearance differences described above—was depicted in an "anime" style that was not meant to literally depict a human being.  *Kirby*, 144 Cal. App. 4th at 59.

Defendants posit that even if they misappropriated Hamilton's likeness and voice, there are enough differences in other elements of the *Gears of War* games, such as the setting, Cole's occupation, and things that he says, which serve to excuse any misappropriation.  (*See* Br. at 17-19.)  As an initial matter, there are significant factual disputes that underlie these assertions.  For one, Hamilton and Cole share a background as former athletes playing the same sport.  SMDF, ¶ 20.  The fictional in-game setting is also not as fanciful as Defendants describe.  Namely, while it takes place on a planet called Sera, it is still described as an Earth-like planet.  SMDF, ¶ 9.  Defendants also describe the setting as "intergalactic" despite the fact that the entirety of the games take place on a single Earth-like planet.  (Br. at 1, 3, 18; SMDF, ¶ 9.)

Moreover, there are multiple primary playable characters in this video game, which is premised on soldiers in warfare.  The Court must focus its inquiry on the aspects of the Cole character that differentiate him from the other characters in the game and make him memorable and valuable.  It is those characteristics that are the full essence of the Cole character and not the fungible elements that are the same for all characters in the game.  Otherwise, one could take anyone's likeness in its entirety but escape liability by using that likeness in a fictional world. As the Third Circuit explained:

> Acts of blatant misappropriation would count for nothing so long as the larger work, on balance, contained highly creative elements in great abundance.  This concern is particularly acute in the case of media that lend themselves to easy partition such as video games.  It cannot be that content creators escape liability for a work that uses a celebrity's unaltered identity in one section but that contains a wholly fanciful creation in the other, larger section.

28

*Hart*, 717 F.3d at 169.

Thus, it is immaterial that Cole inhabits a non-Earth world or does things that Hamilton would not do (such as killing).  Cole is still a literal depiction of Hamilton which does not serve to transform the character into an expression worthy of protection.  *See Hilton*, 599 F.3d at 911; *No Doubt*, 192 Cal. App. 4th 1034-35.  Indeed, Defendants' same argument was rejected in *No Doubt*.  Like here, the defendants in that case argued that having the *No Doubt* avatars perform songs in fanciful settings (including in outer space) and even perform songs that the real-world band objected to performing was sufficiently transformative.  *No Doubt*,  192 Cal. App. 4th 1034-35.  But the court there concluded that these elements failed to transform the *No Doubt* avatars into anything other than literal depictions of the real band members.  *See id.*

Defendants' cited cases are readily distinguishable from the instant case because, like *Kirby*, none of them involved a literal depiction of the plaintiff.  In *Washington v. Take-Two Interactive Software, Inc.*, the accused video game character had an appearance that was rather "generic," with no features, physical or otherwise, that linked that character to the plaintiff.  No. B232929, 2012 WL 5358709, at *11 (Cal. Ct. App. Oct. 31, 2012).  Indeed, the character could change appearance in the game, depending on the amount of exercise and eating.  *Id.*  The same holds true for all of Defendants' other examples of transformative use.  *See Mitchell v. Cartoon Network, Inc.*, No. 15-5668, 2015 WL 12839135, at *5 (D.N.J. Nov. 20, 2015) (accused character was a giant floating head with no body); *Lohan v. Take-Two Interactive Software, Inc.*, 31 N.Y.3d 111, 120, 122-23 (2018) (accused video game character was simply not recognizable as plaintiff); *Gravano v. Take-Two Interactive Software, Inc.*, 31 N.Y.3d 988, 990 (2018) (plaintiff unrecognizable from the accused video game avatar).

### 4.   Hamilton's Common Law Right of Publicity Claim Should Proceed

As discussed above, Hamilton has demonstrated that a reasonable juror would easily find

that his identity has "commercial value." *See supra* Part III.A.3. Even if this were not the case, Hamilton's common law claims should proceed because Defendants' improperly impose a commercial value requirement, which this Court previously rejected.

Like here, the defendant in *Fanelle v. LoJack Corp.* argued that plaintiff's appropriation of publicity claim failed because plaintiff failed to prove commercial value, which this Court viewed as whether a non-celebrity could assert such a claim. *See* C.A. No. 99-4292, 2000 WL 1801270, at *10 (E.D. Pa. Dec. 7, 2000). In rejecting a commercial value requirement, this Court stated:

> Inherent in the act of a defendant using a person's name, identity, or persona in a commercially advantageous manner is the presumption that the identity has commercial value. Furthermore, distinguishing between celebrities and non-celebrities presents a daunting challenge, the least of which is how to deal with the fact that on some occasions, the communication at issue case itself may give rise to celebrity status that had not existed before. Moreover, I am convinced that the right of publicity resides in every person, not just famous and infamous individuals.

*Id.* at *11; *see also Rose v. Triple Crown Nutrition, Inc.*, No. 4:07-CV-00056, 2007 WL 707348, at *3 (M.D. Pa. Mar. 2, 2007) ("[Plaintiff] has alleged that defendant used his photograph without authorization and for its own commercial advantage. That is all that he needed to do to allege a cause of action based on the right of publicity."); *Lewis*, 527 F. Supp. 2d at 428 (acknowledging *Rose* and *Fanelle* for the proposition that "[a]n allegation of commercial value may not be required"). Put another way, if Defendants took what is Hamilton's, then what they took necessarily has value.

Finally, Defendants cite *Seale v. Gramercy Pictures* for the proposition that "a video game character is not a 'commercial use'" and thus, logically, no plaintiff can proceed under Pennsylvania's common law right of publicity in the context of video games. (*See* Br. at 28-29 (citing *Seale*, 949 F. Supp. 331, 337-40 (E.D. Pa. 1996)).) Like Defendants' subsummation

arguments, Defendants again argue for an absurd result.  *See supra* Part III.B.2.  But even

beyond this, *Seale* does not help Defendants.  Not only does *Seale* fail to address video game

characters, (*See* Br. at 29.), more importantly that case does not apply the same law at issue here.

*Seale* noted that Pennsylvania's right of publicity law at the time was "cloudy and muddled" and

predicted that the Pennsylvania Supreme Court would clarify this area of law by adopting § 46 of

the Restatement (Third) of Unfair Competition.  *Seale*, 949 F. Supp. at 337.  Section 46, in turn,

limited liability for infringing the right of publicity "for the purposes of trade."  *Id.*  What

Defendants fail to mention is that the Pennsylvania Supreme Court has not adopted the

Restatement (Third) of Unfair Competition in this area.  *See AFL Philadelphia LLC*, 639 F.

Supp. 2d at 530 (noting that the prediction in *Seale* never came to pass and therefore the

Restatement (Second) of Torts appropriation analysis applies).

### 5.      Hamilton's Common Law Invasion of Privacy Claim Should Proceed

While Defendants distinguish Hamilton's invasion of privacy by misappropriation claim

from his right of publicity claim, their argument as to why the invasion of privacy claim should

be dismissed is again based upon (1) alleged lack of value or prestige of Plaintiff's likeness, and

that (2) Defendants did not appropriate Hamilton's likeness, both questions of fact.  (Br. at 29.)

First, the value and prestige of Hamilton's likeness is apparent: he is a former

professional football player and wrestler.  Defendants do nothing new here to refute, as

indisputable, the evidence that Hamilton's identity has no value.  Whether Hamilton has a

"valuable interest" in his likeness is a question of fact that should be decided by a jury.  *See*

*Tillery*, F. Supp. 2d at 351.

Second, as described above, Defendants duplicated nearly every aspect of Hamilton's

physical appearance: face, race, voice, hair style, skin tone, physique, and also used his

professional athletic background, and even distinctive outfits, for the Cole character in Gears of

War.  *See supra* Part III.A.2.  As with the common law right of publicity claim, if Defendants

took something that rightly belonged to Hamilton, then they necessarily took something of value.

*See Fanelle*, 2000 WL 1801270, at *11.

### 6.     Hamilton's Unjust Enrichment Claim Should Proceed

Defendants are simply wrong in asserting that unjust enrichment requires an

unconsummated or void contract.  *See Steamfitters Local Union No. 420 Welfare Fund v. Philip

Morris*, 171 F.3d 912, 936 (3d Cir. 1999) (unjust enrichment is *typically*, but not always, invoked

in a quasi-contractual setting).  They are also wrong in asserting that it is not a separate cause of

action.  *See Limbach Co., LLC v. City of Philadelphia*, 905 A.2d 567, 574-75 (Pa. Commw. Ct.

2006).

Rather, the elements of unjust enrichment under Pennsylvania law are: (1) benefits

conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3)

acceptance and retention of such benefits under such circumstances that it would be inequitable

for defendant to retain the benefit without payment of value.  *Gabriel v. Giant Eagle, Inc.*, 124 F.

Supp. 3d 550, 568 (W.D. Pa. 2015).  A claim for unjust enrichment is, by nature, fact-sensitive,

and courts focus on whether the defendant has been unjustly enriched rather than the intent of the

parties.  *See Limbach*, 905 A.2d at 577.  Indeed, the "unjust" element of an unjust enrichment

claim is the "most significant" one under Pennsylvania law.  *Gabriel v. Giant Eagle, Inc.*, 124 F.

Supp. 3d at 569.

As discussed above, Defendants knew about Hamilton through Mr. Speight.  *See supra*

Part III.A.4.  Given this relationship, as well as the number of striking similarities between the

character Cole and Hamilton, a reasonable juror is entitled to disbelieve Defendants' self-serving

testimony and conclude that they unjustly benefitted from misappropriating Hamilton's identity.

One final point which bears mentioning is Defendants' contention that "[c]ourts routinely dismiss unjust enrichment claims that accompany right of publicity claims as duplicative or derivative."  (Br. at 30 (citations and quotations omitted).)  Here, Defendants seek to dismiss the entirety of Hamilton's right of publicity claims, either through Transformative Use or entirely abolishing such claims on video games under Pennsylvania law.  Were this so, Hamilton's unjust enrichment claim would not possibly be duplicative as it would be the only remaining claim.

## IV.    CONCLUSION

For the foregoing reasons, Hamilton respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.


Dated: March 1, 2019

                                        *Respectfully submitted,*

                                         */s/ Benjamin E. Gordon*
                                        Joe N. Nguyen (Pa. ID No. 93638)
                                        Benjamin E. Gordon (Pa. ID No. 311741)
                                        STRADLEY RONON STEVENS & YOUNG, LLP
                                        2005 Market Street, Suite 2600
                                        Philadelphia, PA 19103
                                        T: (215) 564-8000
                                        F: (215) 564-8120
                                        E: JNguyen@Stradley.com;
                                            BGordon@Stradley.com

                                         - and -

                                        John M. Pierce (*admitted pro hac vice*)
                                        PIERCE BAINBRIDGE BECK
                                        PRICE & HECHT LLP
                                        600 Wilshire Boulevard, Suite 500
                                        T: (213) 262-9333
                                        E: jpierce@piercebainbridge.com

                                         - and -

Carolynn G. Beck (admitted *pro hac vice*)
PIERCE BAINBRIDGE BECK
PRICE & HECHT LLP
One Thomas Circle NW, Suite 700
Washington, DC 20005
T: (213) 262-9333
E: cbeck@piercebainbridge.com

 - and -

Maxim Price (admitted *pro hac vice*)
David L. Hecht (admitted *pro hac vice*)
Patrick Bradford (admitted *pro hac vice*)
Yi Wen Wu (admitted *pro hac vice*)
PIERCE BAINBRIDGE
BECK PRICE & HECHT LLP
20 West 23rd St., 5th Floor
New York, NY 10010
T:  (212) 484-9866
E:  mprice@piercebainbridge.com;
dhecht@piercebainbridge.com;
pbradford@piercebainbridge.com;
wwu@piercebainbridge.com

*Counsel for Plaintiff Lenwood Hamilton*