**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LENWOOD HAMILTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:17-cv-00169-AB** |
| | ) | |
| **LESTER SPEIGHT, EPIC GAMES, INC.,** | ) | |
| **MICROSOFT, INC., MICROSOFT** | ) | |
| **STUDIOS, and THE COALITION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................ 1

II.    ARGUMENT ................................................................................................... 3

       A.     The Transformative Use Test Requires Dismissal of Hamilton's Lawsuit. ............3

       B.     There Is No Evidence that the *Gears* Games Incorporate Protectable
              Aspects of Hamilton's Identity. ...........................................................................11

       C.     Each Claim Fails for Independently Sufficient Reasons. ....................................16

              1.     Video games are exempt from the Pennsylvania statute. ........................ 16

              2.     Hamilton adduces no evidence of actual knowledge. .............................. 18

              3.     Hamilton fails to raise a genuine issue of material fact as to any
                     commercial or other value in his identity. ............................................... 20

              4.     No quasi-contractual relationship is identified to support an unjust
                     enrichment claim....................................................................................... 23

III.   CONCLUSION............................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Astaire v. Best Film & Video Corp.*,
116 F.3d 1297 (9th Cir. 1997), *opinion amended by* 136 F.3d 1208 (9th Cir. 1998)..............17

*Boring v. Google, Inc.*,
362 F. App'x 273 (3d Cir. 2010) ............................................................................................23

*Boring v. Google, Inc.*,
598 F. Supp. 2d 695 (W.D. Pa. 2009), *aff'd in part, rev'd in part*,
362 F. App'x 273 (3d Cir. 2010) ............................................................................................23

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988)................................................................................................................17

*Clark v. Martinez*,
543 U.S. 371 (2005)................................................................................................................18

*Collier v. Murphy*,
No. 02 C 2121, 2003 WL 1606637 (N.D. Ill. Mar. 26, 2003) ...........................................17, 18

*Dillinger, LLC v. Elec. Arts Inc.*,
795 F. Supp. 2d 829 (S.D. Ind. 2011) ....................................................................................17

*Estate of Presley v. Russen*,
513 F. Supp. 1339 (D.N.J. 1981) .............................................................................................6

*ETW Corp. v. Jireh Publ'g, Inc.*,
332 F.3d 915 (6th Cir. 2003) ..................................................................................................5

*Facenda v. NFL Films, Inc.*,
488 F. Supp. 2d 491 (E.D. Pa. 2007), *aff'd in part & vacated in part*,
542 F.3d 1007 (3d Cir. 2008)...........................................................................................18, 21

*Facenda v. NFL Films, Inc.*,
542 F.3d 1007 (3d Cir. 2008)...........................................................................................11, 18

*Fanelle v. Lojack Corp.*,
No. CIV.A. 99-4292, 2000 WL 1801270 (E.D. Pa. Dec. 7, 2000).........................................22

*Ford Motor Co. v. Summit Motor Prods., Inc.*,
930 F.2d 277 (3d Cir. 1991)...................................................................................................20

*Gee v. CBS, Inc.*,
471 F. Supp. 600 (E.D. Pa. 1979), *aff'd*, 612 F.2d 572 (3d Cir. 1979)...................................21

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997)............................................................................................22

*Hart v. Electronic Arts, Inc.,*
    717 F.3d 141 (3d Cir. 2013)............................................................... *passim*

*Hilton v. Hallmark Cards,*
    599 F.3d 894 (9th Cir. 2010) ...............................................................................9

*Hoffman v. City of Bethlehem,*
    No. CV 16-1581, 2017 WL 3087994 (E.D. Pa. July 20, 2017)....................13

*In re Chippendales USA, Inc.,*
    622 F.3d 1346 (Fed. Cir. 2010)...........................................................................4

*In re SemCrude L.P.,*
    864 F.3d 280 (3d Cir. 2017)...............................................................................19

*Jones v. Beard,*
    145 F. App'x 743 (3d Cir. 2005) .......................................................................21

*Joseph Burstyn, Inc. v. Wilson,*
    343 U.S. 495 (1952)............................................................................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)..............................................................................................2

*McCabe v. Ernst & Young, LLP,*
    494 F.3d 418 (3d Cir. 2007)................................................................................3

*Mitchell v. Cartoon Network, Inc.,*
    No. 15-5668, 2015 WL 12839135 (D.N.J. Nov. 20, 2015) .........................7

*Motschenbacher v. R. J. Reynolds Tobacco Co.,*
    498 F.2d 821 (9th Cir. 1974) .............................................................................12

*Neff v. Time, Inc.,*
    406 F. Supp. 858 (W.D. Pa. 1976).....................................................................18

*Newcombe v. Adolf Coors Co.,*
    157 F.3d 686 (9th Cir. 1998) .............................................................................12

*Rose v. Triple Crown Nutrition, Inc.,*
    No. 4:07-CV-00056, 2007 WL 707348 (M.D. Pa. Mar. 2, 2007) .............21

*Sarver v. Chartier,*
    813 F.3d 891 (9th Cir. 2016) ...............................................................................5

*Scott v. Harris*,
   550 U.S. 372 (2007) ................................................................................................13

*Seale v. Gramercy Pictures*,
   949 F. Supp. 331 (E.D. Pa. 1996) .............................................................................5

*Shemela v. Great Lakes Window, Inc.*,
   No. CV 16-86, 2018 WL 3209424 (W.D. Pa. Jan. 18, 2018),
   *report and recommendation adopted as modified*,
   No. CV 16-86, 2018 WL 1755388 (W.D. Pa. Apr. 12, 2018) ................................16

*Steele v. Blackman*,
   236 F.3d 130 (3d Cir. 2001) ....................................................................................19

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ..................................................................................................19

*Washington v. Brown & Williamson Tobacco Corp.*,
   C.A. No. 8200776, 1984 WL 63629 (E.D. Pa. Apr. 27, 1984) ........................19, 21

*Wendt v. Host Int'l, Inc.*,
   125 F.3d 806 (9th Cir. 1997) ...................................................................................12

*White v. Samsung Elecs. Am., Inc.*,
   971 F.2d 1395 (9th Cir. 1992) .................................................................................12

*World Wrestling Fed'n Entm't Inc. v. Big Dog Holdings, Inc.*,
   280 F. Supp. 2d 413 (W.D. Pa. 2003) ........................................................................9

*Worthy v. Carroll*,
   No. CIV.A. 02-6882, 2003 WL 25706359 (E.D. Pa. July 16, 2003) .......................21

**State Cases**

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
   25 Cal. 4th 387 (2001) ................................................................................3, 4, 6, 10

*Costanza v. Seinfeld*,
   693 N.Y.S.2d 897 (N.Y. Sup. Ct. 1999),
   *aff'd as modified by* 719 N.Y.S.2d 29 (N.Y. App. Div. 2001) ...............................11

*De Havilland v. FX Networks, LLC*,
   21 Cal. App. 5th 845 (2018), *cert. denied*, 139 S. Ct. 800 (2019) ...........................10

*Kirby v. Sega of Am., Inc.*,
   144 Cal. App. 4th 47 (2006) ...............................................................................4, 7, 8, 9

*Lackner v. Glosser*,
   892 A.2d 21 (Pa. Super. Ct. 2006) ..........................................................................23

*Limbach Co. v. City of Philadelphia*,
   905 A.2d 567 (Pa. Commw. Ct. 2006) ...................................................................23

*No Doubt v. Activision Publ'g, Inc.*,
   192 Cal. App. 4th 1018 (Cal. Ct. App. 2011) ................................................5, 6, 9

*Noriega v. Activision/Blizzard, Inc.*,
   No. BC 551747, 2014 WL 5930149 (Cal. Super. Ct. Oct. 27, 2014) .................5, 10

*Polydoros v. Twentieth Century Fox Film Corp.*,
   67 Cal. App. 4th 318 (Cal. Ct. App. 1997) .............................................................11

*Romy v. Burke*,
   No. 1236, 2003 WL 21205975 (Pa. Com. Pl. Phil. May 2, 2003) ..........................23

*Ross v. Roberts*,
   222 Cal. App. 4th 677 (2013) .................................................................................10

*Sivero v. Twentieth Century Fox Film Corp.*,
   No. B266469, 2018 WL 833696 (Cal. Ct. App. Feb. 13, 2018),
   *reh'g denied* (Mar. 2, 2018), *review denied* (May 23, 2018) ....................................8

*Washington v. Take-Two Interactive Software, Inc.*,
   No. B232929, 2012 WL 5358709 (Cal. Ct. App. Oct. 31, 2012) .......................9, 19

*Winter v. DC Comics*,
   30 Cal. 4th 881 (Cal. 2003) .................................................................... *passim*

**State Statutes**

42 Pa. Cons. Stat. § 8316 .......................................................................16, 18, 19, 21

**Rules**

Fed. R. Civ. P. 56(c) ..................................................................................................2

Fed. R. Evid. 702 .....................................................................................................22

**Other Authorities**

Restatement (Second) of Torts § 652C (1977) ..........................................................22

## I.      INTRODUCTION

Nothing in Hamilton's opposition overcomes the legal principles that bar his claims as a matter of law.  Even taking the facts he alleges as true, Defendants' use of any persona for the Cole character—whether Hamilton's or otherwise—is transformative.  Further, since the video game is an expressive work, the First Amendment bars the lawsuit, and the Court need not proceed further.  Even if it did, however, Hamilton fails to identify any actual evidence to support his claims.  Not one witness or document shows Epic or Microsoft knew anything about Hamilton before this dispute.  And other than the allegations of generic and unprotectable similarities in likeness and voice, Cole is nothing like Hamilton.  Cole is a vulgar, violent, gun-wielding soldier who is a member of a fictional military squad fighting to defeat a fictional race of reptilian humanoids—*not* a wrestler or mentor to disadvantaged children.  As Hamilton put it, "[Cole] is ignorant, he's boisterous and he shoots people, he cusses people out, *that's not me*." Defendants' Statement of Undisputed Material Facts (Dkt. 116) ("SUMF") ¶ 54.  The Court should grant Defendants summary judgment.

*First*, any alleged use of Hamilton's identity is transformative under the test adopted by the Third Circuit in *Hart v. Electronic Arts, Inc*., 717 F.3d 141, 158-65 (3d Cir. 2013).  Hamilton has not cited and Defendants are not aware of any case where a court applying this test found that a fictional character—whether in a movie, television show, or video game—violated a plaintiff's right of publicity.  Indeed, courts routinely reject right of publicity claims based even on the *literal depiction* of real individuals in expressive works.  This view of the law would not, as Hamilton predicts, permit Defendants to "pluck somebody's identity from the real world, put it in their virtual world with different clothing, and then duck and cover behind the First Amendment."  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Dkt. 113) ("Opp.") at 1.  For example, it would not likely protect the use of

Hamilton's alleged persona in a wrestling game featuring the character "Hard Rock Hamilton." But that is not the case before this Court.  Even if there were evidence to show Defendants used Hamilton's persona to create Cole, because that character exists in a fictional universe, and his actions do not mimic any of Hamilton's real-life roles, the use is transformative.

Second, no evidence supports Hamilton's assertion that Defendants incorporated protectable aspects of his persona into the Cole character.  In his response, Hamilton insists that the similarities between Cole and Hamilton are so obvious that Speight, whom he met once nearly twenty years ago, must have engineered the character such that Cole and Hamilton would "share the same face, race, voice, hair style, skin tone, physique, professional athletic background, and even distinctive outfits."  Opp. at 2.  Even if taken as true, these common characteristics (shared by countless people) are not protectable as a matter of law.  Further, the record demonstrates that Speight provided ***no*** input into Cole's appearance or storyline.

Finally, each of Hamilton's claims fail for independently sufficient reasons.  Based on hyperbole and not the law, Hamilton claims Defendants are asking the Court to "abolish" right of publicity claims based on video games.  But it is the Pennsylvania Legislature, not Defendants, that made this decision:  Video games, like books, movies, and plays, are expressive works that Pennsylvania—like many other state legislatures—have decided merit absolute protection.  It is irrelevant that such games garner "an incredible amount of money," Opp. at 23—just as it is irrelevant that blockbuster films, bestselling books, or Broadway musicals are also profitable. These are protected expressive works, and Pennsylvania's statute excludes them from liability.

Where, as here, "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted).

Hamilton cannot manufacture material issues of fact simply by disagreeing with the consistent evidence that he developed through extensive discovery, and his "bare assertions, conclusory allegations[, and] suspicions" are not sufficient to raise a genuine issue of material fact.  *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 436-37 (3d Cir. 2007) (citation & internal quotation marks omitted).  Discovery shows no basis for Hamilton's claims, which can and should be dismissed as a matter of law.

## II.      ARGUMENT

### A.      The Transformative Use Test Requires Dismissal of Hamilton's Lawsuit.

Video games "enjoy the full force of First Amendment protections."  *Hart*, 717 F.3d at 148.  To balance these protections with individuals' publicity rights, courts in this Circuit use the transformative use test—which examines "whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized" or instead "the very sum and substance of the work."  *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 406 (2001).  To be clear, Defendants never said and do not maintain that this test makes it "nearly impossible" to assert viable claims based on video games.  *See* Opp. at 25.  They did say, as has the Third Circuit, that such a claim only survives in "very narrow" circumstances, i.e., where the character in question not only resembles the plaintiff but also engages in activities for which the plaintiff is known.  *Hart*, 717 F.3d at 163.  Undisputedly, a user playing the *Gears* games as the Cole character cannot play football (or thrashball), wrestle, promote non-violence, or speak against drug use—the traits for which Hamilton claims he is known.  Perhaps recognizing this, Hamilton primarily argues that a work cannot be transformative if it contains a "literal depiction" of the celebrity.  He is wrong.

Hamilton agrees that two cases mark the "bookends" of the transformative use test— *Comedy III*, 25 Cal. 4th at 404-10, and *Winter v. DC Comics*, 30 Cal. 4th 881 (Cal. 2003):

"Where *Comedy III* [which concerned T-shirts depicting the Three Stooges] presents a clear example of a non-transformative use (i.e., mere literal depictions of celebrities recreated in a different medium), *Winter* [which concerned half-human and half-worm comic book characters] offers a use that is highly transformative (i.e., fanciful characters, placed amidst a fanciful setting, that draw inspiration from celebrities)."  *Hart*, 717 F.3d at 161 (cited in Opp. at 26). Latching on to the phrase "literal depiction," Hamilton claims that Defendants cannot satisfy the transformative use test because the Cole character is a "literal depiction" of Hamilton.

As a threshold matter, Plaintiff's analysis of the "literal depiction" standard erroneously compares an alternative Cole avatar to Hamilton.  The Court must focus on the "default" or "primary" avatar.  *See, e.g.*, *id.* at 168 (refusing to consider fact that video game players could alter digital avatars in transformative use analysis; that plaintiff's likeness "is the default position … support[s] our conclusion" that use was not transformative) (emphasis omitted); *Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 59 (2006) (character's "primary costume differ[s] from th[at] worn by" plaintiff).  Hamilton does not claim that Cole's default avatar, which features futuristic armor and weapons, copies his wrestling costume.  And even the alternative avatar on which he largely bases his claim, Superstar Cole, is not a "literal depiction" of him.  Hamilton wears a black bowler hat, formal white shirt collar, shirt cuffs (which he calls "Chippendale" cuffs[1]), and a black tie.  *See* Opp. at 9.  Superstar Cole wears a beige sleeveless top, sunglasses, brown fedora, bandages on his wrists and shoulder, and necklace with a pendant that replicates his

---

[1] Hamilton is not the only performer to wear "Chippendales" cuffs, named for the distinctive costume of the all-male "Chippendales" exotic dance troupe, who perform in a bow tie, shirt collar, and shirt cuffs with a bare torso.  *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 1348-49 (Fed. Cir. 2010) (Chippendales owns registration in the "cuffs and collar" trademark based on "acquired distinctiveness").

signature weapon.  *Id*.  Other than the fact that both costumes include a hat, sleeveless shirt, and wrist adornments, there is no overlap—and most certainly no literal depiction.

But even if Cole *were* a literal depiction of Hamilton, Hamilton would not prevail. "[L]iteral reproductions of celebrities can be 'transformed' into expressive works based on the *context* into which the celebrity image is placed."  *Hart*, 717 F.3d at 162 (emphasis added) (quoting *No Doubt v. Activision Publ'g, Inc.*, 192 Cal. App. 4th 1018, 1033 (Cal. Ct. App. 2011)).  Thus, courts often find transformative use even where the defendant used a "literal depiction" of the plaintiff.  *See, e.g.*, *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 337 (E.D. Pa. 1996) (no claim where defendant used Bobby Seale's actual name and similar likeness "for the purpose of First Amendment expression:  the creation, production, and promotion of a motion picture and history book which integrates fictitious people and events with the historical people and events surrounding the emergence of the Black Panther Party in the late 1960's"); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 936-38 (6th Cir. 2003) (no claim based on realistic painting depicting Tiger Woods with other famous golf players and famed Augusta National Golf Club); *Sarver v. Chartier*, 813 F.3d 891, 905-06 (9th Cir. 2016) (no claim based on fictionalized account of plaintiff's actual experience in the film *The Hurt Locker*); *Noriega v. Activision/Blizzard, Inc.*, No. BC 551747, 2014 WL 5930149, at *4 (Cal. Super. Ct. Oct. 27, 2014) (First Amendment protects video game's use of Manuel Noriega's name and depiction).

Hamilton relies on *Hart* and *No Doubt*, but neither case concludes that use of a "literal depiction" of the plaintiff is dispositive.  In *Hart*, even though the football player avatar possessed many attributes similar to the plaintiff, the decision largely rested on the context in which the player appeared, for "[i]f [the court was] to find some transformative element, [it] must look somewhere other than just the in-game digital recreation of [Hart]."  *Hart*, 717 F.3d at

166.  But the Court found that the game context, like the appearance of the avatar, *was the same* as the original:  "The digital Ryan Hart does what the actual Ryan Hart did while at Rutgers:  he plays college football, in digital recreations of college football stadiums, filled with all the trappings of a college football game."  *Id.*  So, too, in *No Doubt*, where the court held that digital recreations of band members—created after the members participated in a photo session to ensure the avatars would "accurately reflect their appearances, movements, and sounds"—were not transformative.  192 Cal. App. 4th at 1024.  The members' "literal depictions" would be protected if the "context … creates something new, with a further purpose or different character, altering the first likeness with new expression, meaning, or message."  *Id.* at 1034 (citation & internal quotation marks omitted).  But the context of the video game in *No Doubt* did *not* create something new—the avatars "perform[ed] rock songs, the same activity by which the band achieved and maintains its fame."  *Id.*; *see also Estate of Presley v. Russen*, 513 F. Supp. 1339, 1361 (D.N.J. 1981) (Elvis Presley's estate could assert claim against impersonator as he "appropriated the very activity by which [Elvis] acquired his reputation in the first place") (citation & internal quotation marks omitted).  In sum, *Hart*, *No Doubt*, and *Presley* all fall much closer to the *Comedy III* end of the spectrum, where the Three Stooge's image appeared on a T-shirt, with no additional context and no new meaning or expression.

Here, in stark contrast, the Cole character exists in an entirely new and highly transformative universe of intergalactic soldiers fighting the "Locust Horde," a race of reptilian humanoids.  Unlike the avatars in *Hart* and *No Doubt*—which reside in the same setting as the plaintiffs did in real life, on the football field or performing rock songs—Cole appears in a setting and context that is indisputably a fictional world readily distinct from Hamilton's milieu.  Cole is not a wrestler and does not mentor disadvantaged children, practice non-violence, warn

about the dangers of drugs, or extol the virtues of education.  Hamilton's Statement of Disputed

Material Facts (Dkt. 113-1) ("PSDMF") ¶¶ 5-6 (citing articles describing Soul City Wrestling's

"family-friendly mission," letter from a former Philadelphia mayor "acknowledging

[Hamilton's] efforts to help and mentor disadvantaged minority children").  A user cannot even

play "thrashball" at all, much less while playing as Cole.  Quite the opposite, Cole is an

extremely violent, vulgar, fictional soldier on a fictional planet battling a fictional reptilian

enemy.  SUMF ¶¶ 2, 9; **Exhibit GG**, Excerpts of Deposition of Cliff Bleszinski, at 43:2-11;

**Exhibit HH**, Excerpts of 30(b)(6) Deposition of Cliff Bleszinski, at 31:8-10; SAC (Dkt. 33)

¶ 38.  As Hamilton admitted, "[Cole] is ignorant, he's boisterous and he shoots people, he cusses

people out, *that's not me*."  SUMF ¶ 55.  *See Winter*, 30 Cal. 4th at 886 (use transformative even

though defendant portrayed plaintiffs as "vile, depraved, stupid, cowardly, subhuman individuals

who engage in wanton acts of violence, murder and bestiality for pleasure"); *Mitchell v. Cartoon

Network, Inc.*, No. 15-5668, 2015 WL 12839135, at *5 n.3 (D.N.J. Nov. 20, 2015) ("that the

GBF character places Plaintiff in an unfavorable light does not bolster Plaintiff's right of

publicity claim").

　　　In short, this action is at the end of the spectrum occupied by *Winter*.  There, it was

undisputed that the comic book "Autumn Brothers" was conceived to resemble the "Winter

Brothers" and incorporated many of their most salient features (e.g., their albino features and

white hair and one of the brothers' black top hat).  30 Cal. 4th at 886.  But, because they were

placed in a fictional world, including being depicted as "half worms," the use was plainly

transformative.  *Kirby*, a case Hamilton inexplicably relies on, contains similar analysis.  Even

though the *Kirby* court found "similarities" between the plaintiff and the video game character, it

held that the First Amendment barred Kirby's claims.  Ulala, the video game character, was not a

"mere imitation" of Kirby: the character's "typical hairstyle and primary costume" differed from Kirby, their dance moves were dissimilar, and the game's setting—a space-age news reporter in the 25th century—was "unlike any public depiction of Kirby." 144 Cal. App. 4th at 59-60. Accordingly, the court found that the video game created "new expression," and any similarities with Kirby were simply "part of the raw material from which the Ulala character, and [the game], were synthesized." *Id.* at 61. Like the comic book characters in *Winter*, "Ulala is a 'fanciful, creative character' who exists in the context of a unique and expressive video game" and is therefore "protected by the First Amendment." *Id.* The same reasoning applies here: notwithstanding the alleged similarities between Hamilton and Cole, the video game character— a soldier fighting reptilian humanoids on the planet Sera—is highly transformative.

Perhaps recognizing this, Hamilton asks the Court to disregard any similarities between Cole and the other *Gears* characters. *See* Opp. at 28-29 (citing *Hart*, 717 F.3d at 169). *Hart* says no such thing. In *Hart*, the court refused to consider as part of its transformative use analysis "creative elements of [the video game] which *do not affect* Appellant's digital avatar." 717 F.3d at 169 (emphasis added). But the creative elements of the *Gears* games, including what the characters do and where they do it, directly affect the Cole avatar's identity. No case supports Hamilton's novel theory, which would require courts to assess transformative use by ignoring the very characteristics that render a use transformative. Accordingly, the California Court of Appeal, affirming dismissal of a claim based on a cartoon character, rejected a similar argument: That other characters "share some of the same physical characteristics does not detract from the point these physical characteristics are transformative" and instead "highlights the very point that the creative elements predominate in the work." *Sivero v. Twentieth Century Fox Film Corp.*, No. B266469, 2018 WL 833696, at *10 (Cal. Ct. App. Feb. 13, 2018) (citation & internal

quotation marks omitted), *reh'g denied* (Mar. 2, 2018), *review denied* (May 23, 2018).  *Cf. No Doubt*, 192 Cal. App. 4th at 1034 (ability to play as band members in outer space or to pick different songs to sing was irrelevant because "no matter what … the avatars … [perform] the same activity by which the band achieved … its fame") (citation & internal quotation marks omitted).

Hamilton's reliance on *Hilton v. Hallmark Cards*, 599 F.3d 894 (9th Cir. 2010), Opp. at 29, is similarly misplaced.  In that case, the court rejected a claim by heiress Paris Hilton that Hallmark Cards misappropriated her identity in a birthday card.  599 F.3d at 899.  The card included a cartoon waitress with an oversized photograph of Hilton's head superimposed on the waitress's body; identified the waitress as "Paris"; and included Hilton's well-known catch phrase, "that's hot."  *Id.*  As in *Hart* and *No Doubt*, the court found that the identities of the plaintiff's character *and* the settings in which they appeared were the same:  "[W]e see Paris Hilton, born to privilege, working as a waitress," exactly as she was portrayed on her television show, "The Simple Life."  *Id.* at 911.  In contrast, the *Gears* games do not depict Cole in the same way Hamilton portrays himself.[2]

---

[2] Hamilton also relies on *Hilton* to argue that transformative use "is a question of fact."  Opp. at 26.  But *Hilton* does not say the defense always presents a question of fact, nor would such a statement be accurate.  Courts, recognizing that "speedy resolution of cases involving free speech is desirable" under the First Amendment, routinely dismiss cases on the basis of transformative use as a matter of law.  *See, e.g.*, *Winter*, 30 Cal. 4th at 891-92 (citation & internal quotation marks omitted) ("an action presenting this issue [transformative use] is often properly resolved on summary judgment") (collecting cases); *Kirby*, 144 Cal. App. at 59-62 (affirming summary judgment); *World Wrestling Fed'n Entm't Inc. v. Big Dog Holdings, Inc*., 280 F. Supp. 2d 413, 445 (W.D. Pa. 2003) (granting summary judgment); *Washington v. Take-Two Interactive Software, Inc*., No. B232929, 2012 WL 5358709, at *11 (Cal. Ct. App. Oct. 31, 2012) (dismissing right of publicity claim under California anti-SLAPP statute).

Finally, Hamilton ignores entirely the "subsidiary inquiry" posed by *Comedy III* and for good reason, as it underscores a finding of transformative use here.  Under that test, where "the value of the work comes principally from some source other than the fame of the celebrity— [e.g.,] the creativity, skill, and reputation of the [creator]—it may be presumed that sufficient transformative elements are present to warrant First Amendment protection."  25 Cal. 4th at 407. Hamilton adduces no evidence that "the value of the [*Gears of War* games] … derive[s] primarily from [his] fame."  *Id*.  Nor could he.  *Gears of War* is a creative, highly sophisticated interactive work that is driven by character development, complicated storylines, and original artistic design.  It is the highly creative *Gears of War* world that makes the game's success, not any similarity to Hamilton.  *See, e.g.*, *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 863-64 (2018) (transformative use where there was "no evidence that de Havilland as a character was a significant draw"), *cert. denied*, 139 S. Ct. 800 (2019); *Ross v. Roberts*, 222 Cal. App. 4th 677, 683, 688 (2013) (transformative use where "drug-dealing rapper who goes by the name Rick Ross" was undisputedly based on plaintiff, former drug-dealing organized crime kingpin Rick Ross, because "the value of Roberts's [musical] work does not derive primarily from plaintiff's [drug-dealing] fame"); *Noriega*, 2014 WL 5930149, at *4 (use of likeness in video game transformative as the "marketability and economic value of the challenged work in this case comes not from Noriega, but from the creativity, skill and reputation of defendants").

In sum, even if one were to accept that Hamilton's likeness was used in *Gears of War,* any such use was nothing more than one of the "raw materials" to create an entirely new identity that is transformative and fully protected by the First Amendment.  For this reason alone, the action should be dismissed.

**B.     There Is No Evidence that the *Gears* Games Incorporate Protectable Aspects of Hamilton's Identity.**

Even if the Court does not find that the First Amendment protects the Cole character, Defendants are still entitled to summary judgment because there is no evidence of misappropriation.  Hamilton's opposition only underscores why summary judgment is warranted.

Right of publicity case law is littered with plaintiffs who, like Hamilton, saw a character in a fictional movie, television show, or video game and thought, "that's me!"  But as established by the nearly dozen cases Defendants cited, courts routinely dismiss such claims where the plaintiff identifies only generic similarities with a fictional character and fails to demonstrate that these characteristics are uniquely identified with him.  Defendants' Memorandum in Support of Motion for Summary Judgment (Dkt. 109-1) ("Br.") at 20-23.  Indeed, in many cases, the alleged similarities were far less generic than what Hamilton claims here.  *E.g.*, *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 320-21 (Cal. Ct. App. 1997) (plaintiff and character in "The Sandlot" grew up in similar settings, had similar personalities, swam in community pool, and played baseball on a sandlot; plaintiff went to school with film writer and director); *Costanza v. Seinfeld*, 693 N.Y.S.2d 897, 899 (N.Y. Sup. Ct. 1999) (plaintiff and "Seinfeld" character shared last name, were "short, fat, [and] bald," and hailed from Queens), *aff'd as modified by* 719 N.Y.S.2d 29 (N.Y. App. Div. 2001).

Hamilton ignores these cases and instead focuses on cases where, unlike *Gears*, the challenged work was a commercial advertisement.  But there are fewer protections for the alleged use of a real person's identity in an advertisement than in a creative, expressive work like the *Gears of War* games:  Right of publicity law "is targeted at endorsements, not the full universe of creative works" like video games.  *Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1032 (3d Cir. 2008).  Tellingly, Hamilton does not identify a single case involving a fictional or

11

expressive work like *Gears of War* where the plaintiff's right of publicity claim survived summary judgment.

Even in the advertising cases Hamilton cites, the claim only survived summary judgment because the plaintiff offered sufficient evidence that the allegedly appropriated characteristics were *uniquely* or *distinctively* evocative of the plaintiff. *See White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1399 (9th Cir. 1992) (dress, wig, and jewelry worn by robot would have been insufficient to support a misappropriation claim, since "many other women" also dress like this, but claim survived because the robot was turning letters on the game show—and the real Vanna White was "the only one" who did this); *Motschenbacher v. R. J. Reynolds Tobacco Co*., 498 F.2d 821, 822 (9th Cir. 1974) (record demonstrated that plaintiff, an internationally known race-car driver, was known for "individualiz[ing]" his race cars with certain "distinctive" markings that made them "readily identifiable as his own," and defendants used an image of plaintiff's car in advertisement without altering or obscuring its distinctive elements).[3]

There is no equivalent evidence here. Taking the undisputed facts in the light most favorable to Hamilton, both he and Cole are black men and former athletes who at one point played for a team with "Eagles" as the mascot, and who have similar faces, muscular arms, skin tone, and voices. *See* Opp. at 10-15. Hamilton did not (and could not possibly) offer any evidence that would allow a jury to find that these generic characteristics uniquely identify him.

---

[3] *See also Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998) (no summary judgment where defendants admitted image in ad was based on a photo of plaintiff pitching a baseball and record reflected that plaintiff was "the only one who has such a [pitching] stance"); *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 809 (9th Cir. 1997) (triable issue of fact whether robots depicting characters Norm and Cliff from the TV show "Cheers," placed in airport bars modeled on the "Cheers" set, infringed right of publicity of the actors who portrayed Norm and Cliff).

Faced with this reality, Hamilton resorts to unsupported assertions and misrepresents the record.  For example, he claims "Cole dons outfits that resemble ['Hard Rock'] Hamilton's wrestling outfits."  *Id*. at 7.  But he concedes the default Cole avatar does *not* wear such an outfit; instead, his claims largely pertain to "Superstar Cole," a single alternative avatar.  *See id*. at 14.  Even Superstar Cole's attire is different from that of "Hard Rock Hamilton."  *See supra* at 4.  The only similarities between the two—a hat, sleeveless shirt, and something on the wrists—are not protectable.  Hamilton's self-serving assertions in his declaration, and the boilerplate declarations of his chiropractor, son, and son's friends—that they "believe the Superstar Cole outfit looks very much like the Hard Rock Hamilton outfit"—cannot change these facts.  Where, as here, "one party's claims are 'blatantly contradicted by the record, so that no reasonable jury could believe it,' the court should not take those claims as true for the 'purposes of ruling on a Motion for Summary Judgment.'"  *Hoffman v. City of Bethlehem*, No. CV 16-1581, 2017 WL 3087994, at *4 (E.D. Pa. July 20, 2017) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)), *aff'd*, 739 F. App'x 144 (3d Cir. 2018)).

Nor does Hamilton offer any evidence that Cole shares facial features uniquely associated with Hamilton.  Hamilton claims that he and Cole "look alike," relying on conclusory, self-serving declarations from friends and family, as well as an unreliable and inadmissible expert report from Dr. Benham Bavarian, whose testimony Defendants will move to exclude (as necessary).  Dr. Bavarian admitted that the publicly available software he used to compare images of Hamilton and Cole only compares *images as a whole*, not faces or facial features.  **Exhibit II**, Excerpts of Deposition of Benham Bavarian, M.D. at 67:8-13, 117:18-118:12.  Further, Dr. Bavarian's comparisons of eight photos of Hamilton and seven images of Cole resulted in average similarity scores ranging from 29-48 percent.  Even Dr. Bavarian's cherry-

picked "best quality" comparisons only yielded similarity percentages between 47 percent and 68

percent, falling below the 70 percent threshold identified by Dr. Bavarian as indicating a "high

likelihood that it is the same person in the two compared photos."  Dr. Bavarian also failed to

compare Cole with any images of men other than Hamilton, much less men of similar age, race,

weight, and build.  *Id.* at 190:23-191:3.  Consequently, he cannot say whether Cole is any more

similar to Hamilton than he would be to millions of others.  *Id.* at 193:15-194:3.

Lacking any evidence to support his claims, Hamilton then insists Speight is a "smoking

gun" who creates a "direct line" (Opp. at 2) between Cole and Hamilton based on the following

speculative assertions:  Hamilton and Speight were "wrestling mates," *e.g.*, *id*. at 6; Speight

"modeled Cole's voice after … Hamilton's," *id.* at 19; Speight must have told Epic and

Microsoft about Hamilton, *id*. at 18; and Speight provided "input" and "influence" into Cole's

likeness and backstory, PSDMF ¶ 11.  But not a single step along this "direct line" is supported

by evidence.  In fact, each is *directly contradicted* by the undisputed record.

First, Speight and Hamilton were not "wrestling mate[s]," as they undisputedly met only

once at a bout in July 1998 where they did not even wrestle against each other.  SUMF ¶¶ 69-71,

76; Defendants' Ex. M (Dkt. 110-5) (Speight Tr.) 92:9-15, 93:13-20; *see also id.* at 91:10-12

(Speight knew "zero, nothing" about Hamilton before the match).  Second, there is no evidence

that Speight modeled Hamilton's voice.  Once again, Hamilton relies on a questionable expert

report that would never be admissible.  His alleged voice expert, Edward Primeau, compared in-

game audio of Cole's dialogue with recordings where he *instructed* Hamilton to perform those

lines with the same "energy, intonation, performance" to be "as similar to the [recording of Cole]

as possible."  **Exhibit JJ**, Excerpts of Deposition of Edward Primeau, at 110:2-21, 210:25-211:9;

*see also id.* at 106:10-108:13, 110:23-111:9.  But even with this direction, Hamilton was unable

14

to produce sufficiently similar performances of the *Gears* dialogue by reading a script; it was only once Primeau played each audio sample from *Gears* for Hamilton and had him repeat it back that Hamilton was able to create a sample that Primeau considered "similar." *Id.* at 106:10-108:13, 110:23-111:13, 115:21-116:16, 117:4-24.

Primeau also admitted he could not identify any distinctive aspects of Hamilton's voice, concluding only that Hamilton spoke with what Primeau called an "urban dialect"—a dialect Primeau admitted was "fairly common." *Id.* at 126:10-129:8. Like Dr. Bavarian, Mr. Primeau did not understand the software he used, *id.* at 182:6-20, and he did not test his conclusions by comparing, for example, Speight's ordinary voice with Hamilton's (i.e., to test the baseline similarity of their voices), or Hamilton's ordinary speaking voice with the game dialogue or the recordings he created for this case (i.e., to test whether Hamilton was deliberately changing his voice to imitate the game), *id.* at 106:1-9, 135:22-25, 142:1-10, 141:16-25, 211:11-16, 223:7-23, 225:16-228:24, 248:16-24. Consequently, Primeau admitted he had "*no way of knowing*" whether the Cole actor was imitating Hamilton, as opposed to the inverse—and far more likely—scenario: that Hamilton was imitating Cole in Primeau's recordings. *Id.* at 131:15-25.

Third, there is no support for Hamilton's assertion that Microsoft or Epic ever heard of him before this dispute, or that Speight ever exercised any influence on Cole's appearance or storyline.[4] The record establishes the opposite. *See* SUMF ¶¶ 7, 77-81. Every witness asked about this issue uniformly testified Speight provided *no* such input. *Id.* ¶¶ 20, 23. Unsurprisingly, there is *no* reference to Hamilton or Soul City Wrestling in any Defendant's

---

[4] Plaintiff is aware that he lacks such evidence: when he sought leave to file a Third Amended Complaint after the close of discovery, his proposed complaint alleged "*[u]pon information and belief*" that "Speight was directly involved in the development in conjunction with Epic, and incorporated Hamilton's image, likeness and voice into the Augustus Cole character." *See* Proposed Third Amended Complaint (Dkt. 95-3) ¶ 45.

records.  *See* Doran Decl. dated Sept. 14, 2018 (Dkt. 82-2), ¶ 4 (Microsoft "searched for but found no documents that mention Mr. Hamilton, Soul City Wrestling, or 'Hard Rock Hamilton'").  Instead, the "source art" files for Cole contain images of numerous celebrities, athletes, and musicians, but *not Hamilton*.  SUMF ¶ 7; Fergusson Decl. (Dkt. 110-4) ¶¶ 8, 9. Hamilton offers no evidence to the contrary, and "[t]his Court is not obligated to ignore the uncontradicted testimony and documentation presented by Defendant[s]."  *Shemela v. Great Lakes Window, Inc.*, No. CV 16-86, 2018 WL 3209424, at *13 (W.D. Pa. Jan. 18, 2018), *report and recommendation adopted as modified*, No. CV 16-86, 2018 WL 1755388 (W.D. Pa. Apr. 12, 2018).

### C.  Each Claim Fails for Independently Sufficient Reasons.

Finally, the Court should dismiss Hamilton's claims because each of them fails as a matter of law for the following reasons.

#### 1.  Video games are exempt from the Pennsylvania statute.

Pennsylvania's right of publicity statute exempts "expressive works," defined as a "[a] literary, dramatic, *fictional*, historical, *audiovisual* or musical work, *regardless of the communications medium* by which it is exhibited, displayed, performed or transmitted, other than when used or employed for a commercial or advertising purpose."  42 Pa. Cons. Stat. § 8316 (emphasis added).  Hamilton claims that video games do not fall within this exemption because they are "used for a commercial purpose."  Opp. at 23.  Again, he is wrong.

First, the statutory language plainly exempts any "fictional" or "audiovisual" work, "regardless of the communications medium."  Video games are such works, as they are essentially interactive movies.  Fergusson Decl. ¶¶ 4-7.  Accordingly, they are "expressive speech" that "enjoy the full force of First Amendment protections."  *Hart*, 717 F.3d at 148. Without citing to a single case, Hamilton argues, that merely because video games are

"expressive speech" does not mean they are "expressive works."  Opp. at 23.  But courts have

construed similar statutory language to categorically exempt expressive works, including video

games.  *See, e.g.*, *Dillinger, LLC v. Elec. Arts Inc.*, 795 F. Supp. 2d 829, 832-33 (S.D. Ind. 2011)

(video games exempt from liability under Indiana's right of publicity statute, which exempted

"[l]iterary works, theatrical works, musical compositions, film, radio, or television programs");

*Collier v. Murphy*, No. 02 C 2121, 2003 WL 1606637, at *2 (N.D. Ill. Mar. 26, 2003) (television

program within Illinois statute exemption for a "live performance, a single and original work of

fine art, play, book, article, musical work, film, radio, television, or other audio, visual, or audio-

visual work"); *Astaire v. Best Film & Video Corp.*, 116 F.3d 1297, 1300-04 (9th Cir. 1997)

(instructional video within California exemption for "[a] play, book, magazine, newspaper,

musical composition, audiovisual work, radio or television program"), *opinion amended by* 136

F.3d 1208 (9th Cir. 1998).  The legislative history for the Pennsylvania statute supports this

conclusion:  A 2003 Bill Summary acknowledged "there ... [is no] liability … when the

plaintiff's character, occupation, and the general outline of his career, with many real incidents in

his life, are used as the basis for a figure in a novel who is still clearly a fictional one."  **Exhibit**

**OO**, Jan. 3, 2003 Summary of House Bill 235, P.N. 4677.

Hamilton next claims video games are not "expressive works" because they make "an

incredible amount of money" and are therefore "commercial."  Opp. at 23.  But that argument

would logically apply equally to movies, plays, and television shows—all of which fall within

the plain language of the exemption.  Expressive works are not transformed into "commercial

speech" simply because they are profitable.  *See City of Lakewood v. Plain Dealer Publ'g Co.*,

486 U.S. 750, 756 n.5 (1988) ("[T]he degree of First Amendment protection is not diminished

merely because the newspaper or speech is sold rather than given away."); *Joseph Burstyn, Inc.*

17

*v. Wilson*, 343 U.S. 495, 501-02 (1952) (rejecting claim that First Amendment does not protect movies because they are "conducted for private profit").  Accordingly, courts reject arguments that the use of a persona in expressive works is "commercial" because such works are published for profit.  *See, e.g.*, *Neff v. Time, Inc.*, 406 F. Supp. 858, 861 (W.D. Pa. 1976) ("The fact that Sports Illustrated is a magazine published for profit does not constitute a commercial appropriation of Neff's likeness."); *Collier*, 2003 WL 1606637, at *2  (rejecting plaintiff's claim that television show was a "commercial product," which "would nullify [the statutory exemption's] entire purpose").[5]

The same is true here:  This Court should reject Hamilton's invitation to hold that the statute's exemption for "expressive works" in Section 8316(e) does not include video games, or could be overcome by a showing that the work in question "made an incredible amount of money," as such an interpretation would conflict with the First Amendment.  *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (courts should reject statutory interpretation that "would raise a multitude of constitutional problems").

### 2.    Hamilton adduces no evidence of actual knowledge.

Hamilton does not dispute that the Pennsylvania statute requires a plaintiff to show the defendant possessed "actual knowledge of the unauthorized use of the name or likeness," 42 Pa.

---

[5] Hamilton relies on *Facenda v. NFL Films, Inc*., 488 F. Supp. 2d 491, 513 (E.D. Pa. 2007), *aff'd in part & vacated in part*, 542 F.3d 1007 (3d Cir. 2008), claiming that the Court held that "an NFL Films video was commercial in nature under section 8316."  Opp. at 23.  In fact, the *Facenda* court did not address the expressive works exemption, but rather the scope of a license agreement.  Moreover, the court concluded that the video in question—which was referred to internally as a "promo" and ended with a "countdown" to the release of the next *Madden* video game—was an advertisement and not a documentary.  488 F. Supp. 2d at 496-97, 500-01.  Notably, *Facenda* did not decide whether the underlying video game was commercial speech; that was left to *Hart,* which considered a comparable game and found it was expressive speech, fully protected by the First Amendment.  *See Hart*, 717 F.3d at 170 n.47.  *Facenda* says nothing about whether a video game like *Gears* is an expressive work.

Cons. Stat. § 8316(d).  Nor does he dispute that there is no evidence Microsoft or Epic possessed any knowledge of Hamilton, much less the alleged infringement.  Instead, he argues that the similarities between himself and Cole are so obvious they give rise to an inference of knowledge.

Effectively, Hamilton asserts that "constructive knowledge" is sufficient to satisfy the statute's explicit requirement of "actual knowledge."  It is not.  *See In re SemCrude L.P.*, 864 F.3d 280, 294-95 (3d Cir. 2017); *Steele v. Blackman*, 236 F.3d 130, 133 (3d Cir. 2001) ("Where the language of a statute is clear ... the text of the statute is the end of the matter.").  To construe the statute as Hamilton urges—where evidence of unauthorized use could substitute for evidence of actual knowledge—would render Section 8316(d) meaningless, violating the "cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation & internal quotation marks omitted).[6]

Finding no support from right of publicity law, Hamilton turns to copyright law, reasoning that because a copyright plaintiff can show *access* to an allegedly infringed work by pointing to similarities between that and the allegedly infringing work, so too a right of publicity plaintiff can show *knowledge* because of alleged similarities.  Opp. at 21.  But this is not a copyright claim.  Copyright law, unlike the right of publicity, does not require *any* evidence of

---

[6] *Washington v. Brown & Williamson Tobacco Corp.*, C.A. No. 8200776, 1984 WL 63629 (E.D. Pa. Apr. 27, 1984), on which Hamilton heavily relies, was decided nearly two decades before enactment of the Pennsylvania statute and does not construe its "actual knowledge" requirement. Instead, the question in *Washington* was whether the defendants "*intentionally* chose the photographs of [the actual model] in an effort to avail themselves of the commercial value of the plaintiff's likeness" or "*inten[ded]* to confuse the public as to the plaintiff's sponsorship of their product." *Id.* at *2-3 (emphasis added).  Moreover, unlike here, there was no dispute in *Washington* that the plaintiff was a "well known" musician, and that the defendant had reached out to him directly.  Even though inferences may be left to a jury, Hamilton must still offer sufficient underlying ***facts*** at summary judgment to permit a reasonable juror to make such inferences.  He has not done so.

knowledge—instead, it imposes strict liability. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 299 (3d Cir. 1991) ("[I]t is settled law that innocent intent is generally not a defense to copyright infringement.") (citation & internal quotation marks omitted). Unsurprisingly, Hamilton does not cite any case that applies this principle to a knowledge requirement in a right of publicity case.

Finally, Hamilton tries to manufacture a "dispute" by claiming Speight provided conflicting testimony—that he testified "he had no input into the Cole character" but also "that he tested different voices for Cole and suggested changes to the character's voice and that Cole's appearance morphed over time." Opp. at 19 (citing Ex. M (Speight Tr.) at 32:9-33:4, 44:14-45:2). This mischaracterizes the record. Although Speight did say he "tested different voices"—consistent with his role as the voice actor for Cole—he did not say he had "no input into the Cole character." *See id.* Rather, when asked whether he provided "any input into *what the character looked like*," he replied "Absolutely not." Ex. M (Speight. Tr.) at 44:11-13. Speight's testimony is not only internally consistent, but consistent with the testimony of Microsoft and Epic witnesses, who uniformly stated that Speight's role in creating the Cole character was limited to his voice work. SUMF ¶¶ 17, 20, 23; *see also* Defs. Resp. to PSDMF ¶ 11.

The record unequivocally fails to support Hamilton's assertions of knowledge. For this additional reason, his statutory right of publicity claim fails.

### 3. Hamilton fails to raise a genuine issue of material fact as to any commercial or other value in his identity.

Hamilton does not dispute that the Pennsylvania statute and common law right of publicity require that his name have some discernible commercial or other value that was appropriated by Defendants. As the non-moving party, Hamilton must "point to concrete

evidence in the record" to support these "essential element[s] of his case." *Jones v. Beard*, 145 F. App'x 743, 745-46 (3d Cir. 2005). He has not done so. *See* SUMF ¶¶ 65-67; Br. at 26-27.

First, Hamilton offers no evidence of any value in his voice or likeness that was allegedly appropriated by Defendants.[7] Although he claims his likeness generally has value as a former athlete, he makes no such claim with respect to his voice. *Cf. Facenda*, 488 F. Supp. 2d at 494 (defendants conceded plaintiff, NFL news anchor, had "legendary" and "distinctive" voice). He also cannot identify any "valuable interest … developed through the investment of time, effort and money," 42 Pa. Cons. Stat. § 8316(e), in any characteristics he claims Cole appropriated, such as his race or physique. As for traits that might be arguably unique to Hamilton, such as his name or the name of his wrestling company, *Gears of War* does not use them. SUMF ¶¶ 43-45. Finally, Hamilton cannot rely on his damages expert, Dr. Barbara Luna, who stated, in conclusory fashion, that Hamilton's "persona/likeness has commercial value" that is "not de minimis." PSDMF Ex. 17, ¶ 46. Dr. Luna admitted she was not asked to make this assessment and did not consider it relevant to her damages analysis. **Exhibit KK**, Excerpts from the Deposition of Barbara Luna, Ph.D., at 115:7-117:15, 206:20-207:12. Further, she based this

---

[7] The Pennsylvania statute applies only to a plaintiff "whose name or likeness has commercial value and is used for any commercial or advertising purpose." 42 Pa. Cons. Stat. § 8316(a). A common-law right of publicity claim similarly requires a showing of commercial value. *See, e.g.*, *Gee v. CBS, Inc.*, 471 F. Supp. 600, 661*-62 (E.D. Pa. 1979) ("right of publicity" is "a right to the ***commercial value*** of one's image, likeness and name") (emphasis added), *aff'd*, 612 F.2d 572 (3d Cir. 1979); *see also, e.g.*, *Worthy v. Carroll*, No. CIV.A. 02-6882, 2003 WL 25706359, at *4 (E.D. Pa. July 16, 2003) (dismissing claim where plaintiff "failed to allege that his name has any *special reputation, prestige, or commercial value* or that defendants used it for *commercial purposes*") (emphasis added); *Washington*, 1984 WL 63629, at *1 (analyzing "right of publicity" claim as whether defendants "appropriated for themselves the *commercial value* of plaintiff's image and likeness") (emphasis added). Courts in this jurisdiction have distinguished common-law privacy and publicity claims on the basis that the privacy claim "does not require the appropriation to be done commercially." *Rose v. Triple Crown Nutrition, Inc.*, No. 4:07-CV-00056, 2007 WL 707348, at *3 (M.D. Pa. Mar. 2, 2007).

opinion on Hamilton's self-serving allegations in discovery, and an assumption that a persona must have value if someone appropriates it.  PSDMF Ex. 17, ¶ 46; Ex. KK (Luna Tr.) at 63:18-66:16, 124:8-133:12.  This is classic "ipse dixit" that the Court should disregard under Rule 702. *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

Echoing Dr. Luna's reasoning, Hamilton claims he can proceed on his common-law claims even without evidence of value since "if Defendants took what is Hamilton's, then what they took necessarily has value."[8]  Opp. at 30.  This logic is circular and ignores an essential element of Hamilton's claims.  Mere similarities between the plaintiff and the challenged work are "not enough"; there must be evidence that the defendant has "pass[ed] himself off as the plaintiff or *otherwise [sought] to obtain for himself the values or benefits* of the plaintiff's name or identity."  Restatement (Second) of Torts § 652C cmt. c (1977) (emphasis added).  "It is only when the publicity is given *for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or the likeness* that the right of privacy is invaded."  *Id.* cmt. d (emphasis added).  While Defendants do not dispute that a plaintiff need not be a "celebrity" to bring a claim, he must still offer evidence of the elements of his claims:  a valuable property right in what was allegedly appropriated, and a benefit appropriated by the Defendants in using it.  Hamilton has done neither.  *See* Br. at 28-30.

---

[8] Hamilton draws this assertion from *Fanelle v. Lojack Corp.*, No. CIV.A. 99-4292, 2000 WL 1801270, at *10 (E.D. Pa. Dec. 7, 2000).  Opp. at 30.  But in *Fanelle*, the defendant undisputedly made commercial use of the plaintiff's image by including his photograph in a promotional package, and the court found sufficient undisputed facts in the record from which to infer that the plaintiff's image had "value" to the defendant from a "business perspective."  There is no comparable record here.

### 4. No quasi-contractual relationship is identified to support an unjust enrichment claim.

Finally, Hamilton's unjust enrichment claim fails because he fails to identify any quasi-contractual relationship. Hamilton does not dispute that there is no "void or unconsummated contract" here, which he admits is "typically" required. Opp. at 32. Instead, he claims his unjust enrichment claim should proceed based on the alleged *tortious* conduct of Defendants. *See id.* (claiming jury could find that Defendants "unjustly benefited from *misappropriating* Hamilton's identity"). But unjust enrichment claims based on tortious conduct alone are improper. *See Boring v. Google, Inc.*, 598 F. Supp. 695, 702-03 (W.D. Pa. 2009) (unjust enrichment claims based on tort claims are "subsumed" by such tort claims), *aff'd in part, rev'd in part*, 362 F. App'x 273, 282 n.9 (3d Cir. 2010) (declining to address issue).

Hamilton cites no case to the contrary. The case on which he relies, *Limbach Co. v. City of Philadelphia*, 905 A.2d 567 (Pa. Commw. Ct. 2006), considered a breach of contract action where a nonparty to the contract was seeking *quantum meruit*. *Id.* at 574-75. Further, unjust enrichment claims "make[] sense in cases involving a contract or a quasi-contract, but not, as here, where plaintiffs are claiming damages for torts committed against them by ... defendant[s]." *Boring v. Google, Inc.*, 362 F. App'x 273, 282 (3d Cir. 2010) (quoting *Romy v. Burke*, No. 1236, 2003 WL 21205975, at *5 (Pa. Com. Pl. Phil. May 2, 2003)); *see also Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) (finding that unjust enrichment claims "do[] not apply simply because the defendant may have benefited as a result of the actions of the plaintiff").

Finally, the notion that Hamilton's unjust enrichment claim could somehow survive despite dismissal of the misappropriation tort claims—a proposition for which Hamilton provides no authority—is refuted by the numerous cases cited in Defendants' Memorandum. *See* Br. at 30-31 (collecting cases dismissing unjust enrichment claims that accompany right of

publicity claims as "duplicative or derivative").  Hamilton does not and cannot distinguish these

cases, and his unjust enrichment "claim" fails as a matter of law.

## III.   CONCLUSION

For these reasons, Defendants respectfully ask the Court to grant them summary

judgment.


Dated: March 22, 2019                                    Respectfully submitted,


**HANGLEY ARONCHICK SEGAL**             **HANGLEY ARONCHICK SEGAL**
**PUDLIN & SCHILLER**                   **PUDLIN & SCHILLER**


/s/ Bonnie M. Hoffman                   /s/ Bonnie M. Hoffman
William T. Hangley                      William T. Hangley
Bonnie M. Hoffman                       Bonnie M. Hoffman
One Logan Square, 27th Floor            One Logan Square, 27th Floor
Philadelphia, PA 19103                  Philadelphia, PA 19103

Elizabeth A. McNamara (*pro hac vice*)  Robert C. Van Arnam (*pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**           Andrew R. Shores (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor **WILLIAMS MULLEN, P.C.**
New York, NY 10020                      301 Fayetteville Street, Suite 1700
                                        Raleigh, NC 27601
Ambika K. Doran (*pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**           *Counsel for Defendant Epic Games, Inc.*
1201 Third Avenue, Suite 2200
Seattle, WA 98101


Alison Schary (*pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006

*Counsel for Defendants Microsoft, Inc.,*
*Microsoft Studios, The Coalition, and Lester*
*Speight*

## <u>CERTIFICATE OF SERVICE</u>

I, Bonnie M. Hoffman, hereby certify that on March 22, 2019, I caused a copy of the

foregoing Defendants' Reply in Support of their Motion for Summary Judgment and Response to

Plaintiffs' Statement of Disputed Material Facts to be electronically filed and served via the

Court's CM/ECF System on all counsel of record.

Dated:   March 22, 2019

<div style="margin-left: 45%;">

*/s/ Bonnie M. Hoffman* _____

Bonnie M. Hoffman

*Attorney for Defendants Lester Speight, Epic
Games, Inc., Microsoft, Inc., Microsoft Studios and
The Coalition*

</div>