**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

LENWOOD HAMILTON,

      Plaintiff,

      v.

LESTER SPEIGHT, EPIC GAMES,
INC., MICROSOFT, INC., MICROSOFT
STUDIOS, and THE COALITION,

      Defendants.

Civil Action No. 2:17-cv-00169-AB

**PLAINTIFF'S SUR-REPLY**
**IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ....................................................................................................... 2

    A.   Defendants Seek to Unduly Constrict the Right of Publicity in
        Pennsylvania .......................................................................................... 2

        1.   Under a Plain Reading of Section 8316, Misappropriation in
            Commercial Video Games is Proscribed by the Statute ..................... 2

        2.   Defendants' Articulation of the Transformative Use Test Would
            Make the Right of Publicity Meaningless ................................... 6

    B.   Defendants' Remaining Arguments are Premised on Disputed Issues of
        Material Fact ........................................................................................ 11

        1.   Defendants' Misappropriation of Hamilton's Identity ........................... 11

        2.   Commercial Value of Hamilton's Identity .............................. 15

        3.   Defendants' Actual Knowledge of Misappropriation ............................. 17

    C.   Unjust Enrichment Does Not Require a Contractual Relationship .................... 19

III.  CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Astaire v. Best Film & Video Corp.*,
  116 F.3d 1297 (9th Cir. 1997) ..........................................................................4

*Bailey v. United States*,
  516 U.S. 137 (1995), *superseded by statute as stated in Welch v. United
  States*, 136 S. Ct. 1257 (2016) ........................................................................3

*Bentley Sys., Inc. v. Intergraph Corp.*,
  No. CIV. A. 98-3489, 1998 WL 800344 (E.D. Pa. Nov. 16, 1998) ...................13

*Collier v. Murphy*,
  No. 02 C 2121, 2003 WL 1606637 (N.D. Ill. Mar. 26, 2003) .............................4

*Costanza v. Seinfeld*,
  693 N.Y.S.2d 897 (Sup. Ct. N.Y. Cty. 1999), *aff'd as modified by* 719
  N.Y.S.2d 29 (1st Dep't 2001) ..........................................................................12

*Dillinger, LLC v. Elec. Arts Inc.*,
  795 F. Supp. 2d 829 (S.D. Ind. 2011) ................................................................4

*ETW Corp. v. Jireh Publ'g, Inc.*,
  332 F.3d 915 (6th Cir. 2003) ...........................................................................10

*Facenda v. NFL Films, Inc.*,
  542 F.3d 1007 (3d Cir. 2008).............................................................................11

*Fanelle v. LoJack Corp.*,
  C.A. No. 99-4292, 2000 WL 1801270 (E.D. Pa. Dec. 7, 2000) ....................15, 16

*Hart v. Elec. Arts, Inc.*,
  717 F.3d 141 (3d Cir. 2013)......................................................................... *passim*

*Kirby v. Sega of Am., Inc.*,
  144 Cal. App. 4th 47 (Cal. Ct. App. 2006) .........................................................8

*Kligman v. Advanced Polymer Sys., Inc.*,
  No. CIV. A. 00-580, 2001 WL 1173998 (E.D. Pa. Oct. 2, 2001).........................19

*Limbach v. City of Phila.*,
  905 A.2d 567 (Pa. Commw. 2006) ....................................................................19

*Midler v. Ford Motor Co.*,
  849 F.2d 460 (9th Cir. 1988) ...........................................................................13

*Mitchell v. Moore*,
    729 A.2d 1200 (Pa. Super 1999) ...................................................................................19

*Motschenbacher v. R. J. Reynolds Tobacco Co.*,
    498 F.2d 821 (9th Cir. 1974) ......................................................................................12

*Newcombe v. Adolf Coors Co.*,
    157 F.3d 686 (9th Cir. 1998) ......................................................................................12

*No Doubt v. Activision Pub., Inc.*,
    192 Cal. App. 4th 1018 (Cal. Ct. App. 2011) ...........................................................5, 6

*Noriega v. Activision/Blizzard, Inc.*,
    No. BC 551747, 2014 WL 5930149 (Cal. Super. Ct. Oct. 27, 2014) ..........................10

*Polydoros v. Twentieth Century Fox Film Corp.*,
    67 Cal. App. 4th 318 (Cal. Ct. App. 1997) .................................................................12

*Reedy v. Evanson*,
    615 F.3d 197 (3d Cir. 2010) ........................................................................................11

*Reese v. Pook & Pook, LLC.*,
    158 F. Supp. 3d 271 (E.D. Pa. 2016) .....................................................................19, 20

*Samuels v. Hendricks*,
    445 A.2d 1273 (Pa. Super. Ct. 1982) ..........................................................................19

*Sarver v. Chartier*,
    813 F.3d 891 (9th Cir. 2016) ......................................................................................10

*Seale v. Gramercy Pictures*,
    949 F. Supp. 331 (E.D. Pa. 1996) ............................................................................9, 10

*Sivero v. Twentieth Century Fox Film Corp.*,
    No. B266469, 2018 WL 833696 (Cal. Ct. App. Feb. 13, 2018) .................................8, 9

*Smith v. Pitts. Gage & Supply Co.*,
    464 F.2d 870 (3d Cir. 1972) ........................................................................................16

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) .....................................................................................................18

*Summers v. Certainteed Corp.*,
    606 Pa. 294, 997 A.2d 1152 (2010) .............................................................................13

*The Choice Is Yours, Inc. v. The Choice Is Yours*,
    No. 2:14-cv-01804, 2015 WL 5584302 (E.D. Pa. Sept. 22, 2015) ...............................2

*Thorpe v. Borough of Thorpe*,
    770 F.3d 255 (3d Cir. 2014).................................................................................4

*Washington v. Brown & Williamson Tobacco Corp.*,
    C.A. No. 82-0776, 1984 WL 63629 (E.D. Pa. Apr. 27, 1984) ................................17

*Wendt v. Host Int'l, Inc.*,
    125 F.3d 806 (9th Cir. 1997) ........................................................................12, 15

*White v. Samsung Elecs. Am., Inc.*,
    971 F.2d 1395 (9th Cir. 1992) .............................................................................12

*Winter v. DC Comics*,
    30 Cal. 4th 881 (Cal. 2003)................................................................................8, 9

**Statutes**

42 Pa.C.S.A. § 8316.....................................................................................2, 4, 5, 17

**Other Sources**

Rob Keyes, Gears of War 4 Microtransactions Are Out of Control,
    https://screenrant.com/gears-of-war-4-microtransactions-controversy ....................................3

## I.   INTRODUCTION

Augustus "Cole Train" Cole, one of the most famous and recognizable characters in Defendants' blockbuster *Gears of War* video game franchise, *is* Lenwood Hamilton.  The striking similarities between the two are far from "generic and unprotectable," as Defendants argue.  Defendants do not even attempt to address the combination of traits (*i.e.*, face, race, voice, hair style, skin tone, physique, professional athletic background, and outfit) that make Hamilton a unique individual and made his professional wrestling persona a Philadelphia legend. The same combination of traits also makes Cole extremely memorable to *Gears of War* fans.  In fact, Cole has been used by Defendants to promote *Gears of War* in-game purchases and well as the sale of *Xbox* video game consoles bundled with the game.

Ultimately, Defendants' entire motion rests upon a flawed approach to the right of publicity.  Suppose someone makes a movie set in the future.  One of the primary characters is a digital recreation of Wilt Chamberlain.  He looks and sounds like Wilt Chamberlain.  But in the movie, he isn't named Wilt Chamberlain.  Nor does this digital character play basketball—he plays netball, which is exactly like basketball.  And following his netball career, he becomes a firefighter.  The movie goes on to become a commercial success.  Would Wilt Chamberlain have a right of publicity cause of action under Pennsylvania law?

If Defendants have their way, the answer would be "no" because the movie maker "transformed" the work enough by putting Wilt Chamberlain in a different setting, giving him a different name, and giving him a new job.  But this is exactly the flawed approach to right of publicity law that the Third Circuit warned against in *Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 169 (3d Cir. 2013).  The Third Circuit explained that the upshot of this flawed approach is that such "blatant misappropriation would count for nothing so long as the larger work, on balance,

contained highly creative elements in great abundance." *Id.* This Court should reject Defendants' brazen attempt to shape Pennsylvania law to permit such blatant theft.

## II.   ARGUMENT

### A.   Defendants Seek to Unduly Constrict the Right of Publicity in Pennsylvania

#### 1.   Under a Plain Reading of Section 8316, Misappropriation in Commercial Video Games is Proscribed by the Statute

Defendants' belief that commercial video games such as *Gears of War* are entirely exempt from Section 8316 is premised on ignoring the plain text of the statute. Indeed, no court has *ever* held this to be the case, and for good reason.

Defendants are correct insofar as Section 8316 provides an exemption for "expressive works." *See* 42 Pa.C.S.A. § 8316(e)(2)(iii). But "expressive work" is defined in the statute as "[a] literary, dramatic, fictional, historical, audiovisual or musical work regardless of the communications medium by which it is exhibited, displayed, performed or transmitted, *other than when used or employed for a commercial or advertising purpose*." 42 Pa.C.S.A. § 8316(e) (emphasis added). A plain reading of the last phrase indicates that any work "used or employed for a commercial or advertising purpose" takes that work out of the "expressive work" exemption, and within the ambit of Section 8316.

This court has previously defined the phrase "commercial or advertising purpose" in Section 8316 as including "the use of a name or likeness in connection with the offering for sale or sale of product or service, for the purpose of advertising or promoting products or services of a business, or for the purpose of fundraising." *The Choice Is Yours, Inc. v. The Choice Is Yours*, No. 2:14-cv-01804, 2015 WL 5584302, at *4 n.2 (E.D. Pa. Sept. 22, 2015). Defendants used Cole in connection with products that were sold, starting with the *Gears of War* games. Defendants' misappropriation extended to advertising and promotional purposes, including using

*Gears of War* to promote purchases within the game itself (known as "microtransactions" and "downloadable content" ("DLC")).  Indeed, *Gears of War 4* is specifically designed to push its players to spend money on in-game purchases, including add-on packs featuring Superstar Cole.[1] (Ex. 25 at 180:13-181:13; Ex. 26 at 110:4-18.)  Microsoft also used the Cole character in advertisements to promote sales of not only the *Gears of War* video games, but also those games bundled with the *Xbox One* video game system.  An example of these advertisements appears below.[2]



Thus, Hamilton was plainly used for a "commercial purpose" under the statute.[3]

---

[1] *See* Rob Keyes, Gears of War 4 Microtransactions Are Out of Control, https://screenrant.com/gears-of-war-4-microtransactions-controversy (describing *Gears of War 4* as designed to push players to spend more in-game money in a form akin to gambling).  (Ex. 28.)

[2] Image source: https://gearsofwar.com/en-au/community/news/ultimate-edition/bundle (Ex. 24.)

[3] The word "commercial" in the phrase "commercial or advertising purpose" is not simply synonymous with "advertising" because of the canon of statutory interpretation against surplusage.  *See Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning."), *superseded by statute as stated in Welch v. United States*, 136 S. Ct. 1257 (2016).

Rather than address the *text of the statute itself*, Defendants look to everywhere else to support their position, which is untenable. *See Thorpe v. Borough of Thorpe*, 770 F.3d 255, 263 (3d Cir. 2014) ("[courts] look to the text of the statute . . . to interpret a statute or determine legislative intent as an aid to interpretation"). Defendants' argument must fail for at least five reasons.

First, Defendants inexplicably conflate the term "expressive speech," used in the general sense, with the term "expressive work" as *specifically defined in Section 8316*. (*See* Reply[4] at 16-17.) Cases like *Hart* addressed the former (video games as expressive speech), but necessarily were silent on the latter as *Hart* involved the right of publicity law in New Jersey, not Pennsylvania. *See* 717 F.3d at 145, 148.

Second, Defendants further flee from Section 8316's text by looking to statutes in other states for support. (Reply at 17-18.) But right of publicity statutes in Indiana (*Dillinger, LLC v. Elec. Arts Inc.*, 795 F. Supp. 2d 829 (S.D. Ind. 2011)), Illinois (*Collier v. Murphy*, No. 02 C 2121, 2003 WL 1606637 (N.D. Ill. Mar. 26, 2003)), and California (*Astaire v. Best Film & Video Corp.*, 116 F.3d 1297 (9th Cir. 1997)) are wholly irrelevant to interpreting Section 8316 because they contain different operative language. Here, Hamilton is not arguing that "expressive works," which include works that may encompass video games, are not altogether exempt from Section 8316. Rather, the relevant inquiry is whether Section 8316's definition of "expressive work" excludes such works from this exemption because of the phrase "when used or employed for a commercial or advertising purpose." None of the cases that Defendants rely upon discuss such language, and thus citing to them is meaningless.

---

[4] As used herein, "Br." refers to Defendants' Opening Brief In Support of Their Motion for Summary Judgment (Dkt. No. 109-1), "Opp." refers to Hamilton's Opposition Brief (Dkt. No. 113), and "Reply" refers to Defendants' Reply Brief (Dkt. No. 117).

Third, Defendants cite a wholly irrelevant part of Section 8316's legislative history to support their interpretation of the statute.  (Reply at 17.)  The passage of the "2003 Bill Summary" that they cite is simply a summary of common law concepts at the time the legislation was proposed.  (*See* Dkt. No. 117-8, Ex. OO at 2-3.)  It says nothing about the statute itself or what the legislators intended with that statute, including whether or not they intended that commercial video games should be exempt from the statute.

Fourth, it is unclear why—as Defendants assert in conclusory fashion—interpreting Section 8316 to proscribe misappropriation in commercial video games "would conflict with the First Amendment."  (*See* Reply at 18.)  If this were the case, misappropriation that occurs in any expressive speech—including movies, novels, and plays—would similarly be immune to right of publicity causes of action, whether by statute or common law.  We know this is not the case.  *See generally Hart*, 717 F.3d 141; *No Doubt v. Activision Pub., Inc.*, 192 Cal. App. 4th 1018 (Cal. Ct. App. 2011).  To the extent there are any concerns about First Amendment issues, that is what the Transformative Use Test is for—to balance the interests of right of publicity against those of the First Amendment.  *Hart*, 717 F.3d at 163.  As much as Defendants would like it to be, the First Amendment is not a license for wholesale theft of someone's identity.

Finally, while Defendants liken video games to "interactive movies" that are protectable as expressive speech (Reply at 16), that only describes part of the *Gears of War* games.  Each of these games feature multiple game modes, only one of which is a narrative single-player story experience.  (Ex. 25 at 89:17 – 91:3.)  Other game modes, like competitive multiplayer, do not feature any narrative or storytelling and are entirely focused on players controlling avatars like Cole to defeat one another.  (*Id*.)  Indeed, Defendants' misappropriation is even more pronounced here as the "Superstar Cole" outfit features prominently in *Gears of Wars*'

multiplayer mode.  (*Id*. at 180:20 – 181:13.)  Where there is no narrative, dramatic, or storytelling aspect, these parts of the *Gears of War* games do not qualify as "expressive works" whether or not they are used for a commercial or advertising purpose.

### 2.   Defendants' Articulation of the Transformative Use Test Would Make the Right of Publicity Meaningless

The question before the Court boils down to this: if a video game maker were to use a person's resemblance in a video game, right down to how that person looks and sounds, should the video game maker escape liability by merely changing that person's name, occupation, and setting?  This is what Defendants seek when they claim that the Transformative Use Test restricts right of publicity claims so narrowly: "such a claim only survives . . . where the character in question not only resembles the plaintiff but also engages in activities for which the plaintiff is known."  (Reply at 3.)  This unduly restrictive standard finds no support in any case law.

Defendants entirely misread *Hart* when they claim that it supports such an application of the Transformative Use Test.  In *Hart*, the video game avatar in question did—to some degree— resemble the plaintiff[5] and both played football.  717 F.3d at 146.  But the Third Circuit never even hinted that this was the *only* instance in which a right of publicity claim could survive.  Similarly, the court in *No Doubt* offered no opinion on whether the accused avatars would be sufficiently transformative if they were not a rock band.[6]

---

[5] Unlike the instant case, the video game avatar in *Hart* was not a literal depiction of its real-life counterpart in appearance and sound, mimicking only the plaintiff's hair color, hair style, skin tone, and accessories.  *See* 717 F.3d at 166.

[6] Even so, the accused avatars were different than the real-life *No Doubt* band in key respects, including that the avatars played songs that the real-life band would never play, and performing rock concerts in fanciful settings like outer space.  *No Doubt*, 192 Cal. App. 4th at 1034.

To allow video game makers to escape liability by merely changing a character's occupation, name, and setting is exactly the flawed approach to Transformative Use that would lead to the "deleterious consequences" for right of publicity law that the Third Circuit warned against in *Hart*. 717 F.3d at 169. Would we be satisfied that no infringement would be found if Defendants included Wilt Chamberlain in their video game, and merely changed his name and turned him into a soldier[7]? We think not. Otherwise, why would any video game maker ever bother to license the likeness of another individual again? They would simply be able to digitally recreate anyone they wanted with impunity. The effects of such a license to steal are far-reaching. For example, Hollywood could simply bring actors back from the dead, through digital re-creation in computer-generated avatars, in new roles without providing compensation to their estates. Such practice is clearly improper.

Yet another instance of Defendants' erroneous articulation of the Transformative Use Test is their proposal that the "Court must focus on the 'default' or 'primary' avatar" for Cole, in effect asking the Court to blind itself to the "Superstar Cole" avatar. (*See* Reply at 4.) As an initial matter, there are instances where "Superstar Cole" *is* the primary avatar that represents Defendants' theft of Hamilton's identity. As discussed above, Defendants sell add-on game content to *Gears of War* that feature "Superstar Cole" as the main attraction and put that avatar front and center in its advertising materials. (*See supra* pp. 2-3.) The extent of prominence with which this avatar features in Defendants' games and advertising materials is yet another disputed material fact which precludes summary judgment.

---

[7] We are surprised by how Defendants consistently misunderstand their own property by describing Cole as an "intergalactic solder." (Op. at 3, 18; Reply at 6.) *Gears of War* takes place on one planet, the earth-like Sera. (Ex. 19 at 1.) It is not even interplanetary, much less intergalactic.

Additionally, Defendants rely on attorney argument to suggest that the "Superstar Cole" avatar is not the same as the "Hard Rock Hamilton" outfit.  (*See* Reply at 4-5.)  Not only does this conflict with Hamilton's proffered record evidence (*see* Opp. at 8-9, 14) and is another reason why this issue is unresolvable on summary judgment, but Defendants repeat what they have consistently done—view one aspect of misappropriation in isolation.  But what Defendants stole from Hamilton is not merely his wrestling outfit, but also many other aspects of his identity, including his appearance, voice, and background.  (*See id.* at 6-9, 12-15.)

Notwithstanding this, contrary to Defendants' assertion, there is simply nothing that requires this Court to focus only on the "primary" Cole avatar and Defendants' cases provide them no help.  *Hart* focused on the "default" avatar because it recognized that it would otherwise credit an avatar customization feature as transformative, which would open the door to "cynical abuse" that would free video game makers from even the most blatant acts of misappropriation. *See* 717 F.3d at 167-68.  And while the court in *Kirby v. Sega of Am., Inc.* focused its inquiry on the primary accused avatar at issue, it never stated this was required and had no reason to do otherwise because the plaintiff conceded that her appearance constantly changed.  *See* 144 Cal. App. 4th 47, 56 (Cal. Ct. App. 2006).  This is readily distinguishable from the case at hand, where the "Superstar Cole" avatar features prominently in Defendants' games and marketing materials and is readily associated with Hamilton's appearance—that of "Hard Rock Hamilton."

Defendants' attempts to paint any transformative elements in this case—to the extent they even exist—as similar to those in *Kirby*, *Winter v. DC Comics*, 30 Cal. 4th 881 (Cal. 2003), and *Sivero v. Twentieth Century Fox Film Corp.*, No. B266469, 2018 WL 833696 (Cal. Ct. App. Feb. 13, 2018), is not even remotely credible.  (*See* Reply at 7-9.)  Unlike the striking resemblance that Cole bears to Hamilton here in the form of a realistic, computer-generated human image, the

accused work in *Winter* contained "distorted," "half-worm" versions of the plaintiffs. *Winter*, 30 Cal. 4th at 890. Hamilton has already disposed of *Kirby* in the Opposition Brief, noting that the accused character was created in a Japanese "anime" style. (*See* Opp. at 27.) As for *Sivero*, the idiom "a picture is worth a thousand words" comes to mind.[8]

 

Recognizing that cases involving cartoon, inhuman caricatures are not apt comparisons to this case, Defendants pin their hopes on cases where the accused works purportedly contained literal depictions of plaintiffs, but were yet found transformative. (*See* Reply at 5.) But they too are distinguishable. To start, *Seale v. Gramercy Pictures*, 949 F. Supp. 331 (E.D. Pa. 1996), predates the Transformative Use Test, so necessarily the court in that case could not have employed it. Further, Defendants' use of *Seale* is fatally flawed for the same reason they used

---

[8] Image comparing a picture of the plaintiff with the accused work in *Sivero* can be found at:
https://deadline.com/2015/08/simpsons-goodfellas-lawsuit-dismissed-fox-frank-sivero-actor-1201493434.

this case in their Opening Brief—that case does not apply the same law at issue here.  (*See* Opp. at 31 (discussing how the *Seale* court's prediction that the Pennsylvania Supreme Court would adopt the law of Unfair Competition did not come to pass).)  *Sarver v. Chartier* is similarly situated in that the court there explicitly stated that it did not reach the issue of Transformative Use.  813 F.3d 891, 904 n.6 (9th Cir. 2016).  In *ETW Corp. v. Jireh Publ'g, Inc.*, the court found it significant that the accused work portrayed a significant historical event, which is certainly not the case here.  *See* 332 F.3d 915, 936 (6th Cir. 2003).  This is perfectly consistent with works containing transformative elements which are less likely to impinge on the interests that the right of publicity seeks to protect.  *See Hart*, 717 F.3d at 159.  And lastly, *Noriega v. Activision/Blizzard, Inc.* is not an apt comparison because the allegedly copied character barely appears in the accused video game—the use was *de minimis*.  *See* No. BC 551747, 2014 WL 5930149, at *3 (Cal. Super. Ct. Oct. 27, 2014).

Finally, the Third Circuit has noted that the "subsidiary inquiry" in *Comedy III*—whether the marketability and economic value of the accused work is primarily derived from the fame of the celebrities depicted—is merely a secondary question.  *Hart*, 717 F.3d at 163 n.29.  Even so, the record is replete with evidence that Cole is an extremely popular character and, indeed, is featured so heavily that Defendants devoted an entire DLC pack aimed at exploiting Cole's popularity.  (Plaintiff's Supplemental Statement of Disputed Material Facts ("SSMDF"), ¶ 23.)

One additional point bears mentioning.  Defendants seek to use the First Amendment as a get-out-of-jail-free card for their theft of Hamilton's identity in *Gears of War*.  But the avatar of that theft—Cole—appears in much more than just the games.  Cole also prominently features in advertising and marketing material not just for the game, but for sales of the *Xbox* gaming console.  (*See supra* pp. 2-3.)  Such speech undoubtedly does not receive the same level of First

Amendment protection that the games themselves may enjoy.  *See Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1018 (3d Cir. 2008).

> **B.   Defendants' Remaining Arguments are Premised on Disputed Issues of Material Fact**

> > **1.   Defendants' Misappropriation of Hamilton's Identity**

Defendants' belief that there is no evidence of misappropriation betrays a fundamental misunderstanding of the summary judgment standard.  This Court should reject Defendants' invitation to take—as they do—only "the *undisputed* facts in the light most favorable to Hamilton."  (Reply at 12 (emphasis added).)  Rather, what is required is that the Court views *all* of the facts in the light most favorable to Hamilton.  *See, e.g.*, *Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010).

First, Defendants outright admit that the undisputed facts demonstrate that they took what is Hamilton's.  (*See* Reply at 12.)  They recognize—as the evidence shows—that Hamilton and Cole look alike, sound alike, and have the same background.  (*Id.* ("both [Hamilton] and Cole are black men and former athletes who at one point played for a team with 'Eagles' as the mascot, and who have similar faces, muscular arms, skin tone, and voices").)  But in accepting this, they somehow assert that these are merely "generic characteristics" that do not uniquely identify Hamilton.  It is unclear if there exist any ways that can uniquely identify an individual even more short of a DNA test.  How a person looks and sounds are deeply personal traits that are unique to each individual.

Indeed, the cases which Hamilton relies on that proceeded past summary judgment—and which Defendants fail to adequately distinguish—underscore how strong Hamilton's case is in comparison.  Surely, a literal depiction of Hamilton in *Gears of War* which recreates his appearance and voice more uniquely identify him than cases where only certain other

characteristics identified the plaintiff.  *See Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998) (plaintiff's image unseen but was identified by his distinctive pitching stance); *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 809 (9th Cir. 1997) (robot versions of *Cheers* television show characters sitting at a bar), *reh'g denied*, 197 F.3d 806 (9th Cir. 1997), *cert. denied*, 531 U.S. 811 (2000); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1399 (9th Cir. 1992) (robot which looked nothing like the plaintiff but dress and activity evoked her identity); *Motschenbacher v. R. J. Reynolds Tobacco Co.*, 498 F.2d 821, 822 (9th Cir. 1974) (plaintiff entirely unseen, but customized cars evoked his identity).  Along similar lines, Hamilton's literal depiction in *Gears of War* serves to readily distinguish the instant case from those that Defendants rely on, where the plaintiffs claimed only generic similarities.  (*See* Reply at 11 (citing *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 320-21 (Cal. Ct. App. 1997) (all that plaintiff claimed was that a movie character grew up in similar settings, had similar personalities, swam in community pool, and played sandlot baseball); *Costanza v. Seinfeld*, 693 N.Y.S.2d 897, 899 (Sup. Ct. N.Y. Cty. 1999) (all that plaintiff claimed was that *Seinfeld* television character shared the same last name, had a similar physique, and came from the same New York City borough), *aff'd as modified by* 719 N.Y.S.2d 29 (1st Dep't 2001)).)

Second, Defendants assert that Hamilton's claims are "blatantly contradicted by the record," yet point to nothing in the record to support this.  (*See* Reply at 13.)  For example, they have not pointed to anything in the record which shows that Cole does not look like Hamilton, nor have they pointed to anything which shows that Cole does not sound like Hamilton.  At most, they assert that the "Superstar Cole" outfit that Cole dons in *Gears of War* is different than

Hamilton's "Hard Rock Hamilton" outfit.[9]  But they rely on nothing other than attorney argument to support this (*see* Reply at 13), which is not evidence.  In any event, even if Defendants found support in the record that somehow contradicts Hamilton's claims, all this means is that there is a genuine dispute of material fact, making summary judgment inappropriate.  *Bentley Sys., Inc. v. Intergraph Corp.*, No. CIV. A. 98-3489, 1998 WL 800344, at *5 (E.D. Pa. Nov. 16, 1998).

Third, Defendants do not cite a single case demonstrating why Hamilton's expert and fact witness testimony are inadmissible.  Simply wishing for it does not make it so.  At best, Defendants' criticisms of such testimony go to the weight of the evidence, which is a determination uniquely suited for the jury and which the Court—at this stage—must view in the light most favorable to Hamilton.  *Summers v. Certainteed Corp*., 606 Pa. 294, 310, 997 A.2d 1152, 1161 (2010).

For instance, Defendants claim that Hamilton's fact declarations are "conclusory" and "self-serving."  (Reply at 13.)  They fail to elaborate on what makes them "conclusory."  Hamilton's declarants have eyes and ears.  To them, either Cole looks and sounds like Hamilton, or he does not.  Further, whether or not they are "self-serving" is a question for the jury and what weight the jury wishes to assign to such testimony.  Indeed, there is no requirement in right of publicity cases that fact witnesses bear no relation to the plaintiff.  *See, e.g.*, *Midler v. Ford Motor Co.*, 849 F.2d 460, 461-62 (9th Cir. 1988) (court crediting evidence that plaintiff Bette Midler "was told by 'a number of people'" that a recording sounded exactly like her).

---

[9] While the "Superstar Cole" outfit is, in some portions of *Gears of War*, an alternative outfit that players can don for the Cole avatar, Defendants ignore that "Superstar Cole" was the subject and selling point of *Gears of War* downloadable content ("DLC"), which are expansions of the games, and primarily featured in marketing materials. (*See supra* pp. 2-3.)

With respect to Hamilton's facial recognition expert, Dr. Bavarian, Defendants again attack only the weight of the evidence.  Dr. Bavarian's testimony states that similarity scores in the facial comparison software of between 50 to 70 percent similarity show that either the two compared individuals are the same person and picture, or "have a very good intersection of similar face features, landmarks and face structures."  (Ex. 9 at 13.)  Seen in the light most favorable to Hamilton, Dr. Bavarian's comparison of Hamilton with Cole pictures—which yielded similarity percentages of 47 to 68 percent between high quality comparison pictures of the two—demonstrates that they come from the same person or two people who look strikingly alike.  It is notable that Defendants entirely ignore that Dr. Bavarian's expert disclosure employed not just facial comparison software to identify whether Hamilton and Cole looked alike, but also a photo-anthropometric method to quantify and measure landmark features between two faces.  Using this method, Dr. Bavarian also concluded that Hamilton and Cole's faces were quite close to one another.  (*Id.* at 18.)

Defendants' attacks on Hamilton's voice expert, Mr. Primeau, suffer from the same defects—they all go towards the weight of the evidence.[10]  (*See* Reply at 15.)  It is telling that Defendants resort to this rather than what would be the most direct method of countering Hamilton's voice expert testimony—employing their own expert to independently test whether Hamilton and Cole's voices were similar.  They did not.  (*See* Ex. 29 at 33:16-34:2 (Q: Are you offering any opinion as to degree of similarity between Mr. Hamilton's voice and the voice of

---

[10] Defendants suggest that in recording the exemplar audio samples that Mr. Primeau used to compare with the *Gears of War* in-game audio samples, Hamilton was somehow able to modulate his voice to match the in-game samples.  (*See* Reply at 14-15.)  Considering the extent to which the in-game Cole voice matches that of Hamilton (with most of the samples ranging from 96 to 99 percent match), and factoring in that Defendants readily admit that Hamilton is not a voice actor nor has any voice acting training, the odds of Hamilton being able to accomplish the feat of which he is accused are, to put it generously, remote.  (*See* Ex. 31 at 235: 17-22).

Cole?  A: No.).)  One wonders whether Defendants, who are undoubtedly well-funded companies, did not want to see a result they would not like.

Finally, Defendants oddly state that Hamilton "does not identify a single case involving a fictional or expressive work like *Gears of War* where the plaintiff's right of publicity survived summary judgment."  (Reply at 11-12.)  But they are incorrect.  In *Wendt*, the Ninth Circuit determined that there were genuine issues of material fact concerning whether defendant infringed on plaintiffs' right of publicity by placing animatronic robots based on them in airport bars modeled on the bar from the television show *Cheers*.  *See* 125 F.3d at 809.  Using robot versions of these plaintiffs' *Cheers* characters ("Norm" and "Cliff," which defendant renamed to "Bob" and "Hank" in their accused works) in an airport bar is, undoubtedly, a dramatic presentation that is worthy of at least the same treatment as video games.

### 2.    Commercial Value of Hamilton's Identity

Defendants rely on straw man arguments in asserting that Hamilton did not demonstrate commercial value in his identity that they misappropriated.[11]  Rather than address Hamilton's ample evidence of commercial value in his identity as a whole (Opp. at 15-17), Defendants parse out individual characteristics such as voice, race, or physique.  (Reply at 21.)  But Hamilton has never maintained that it is solely these characteristics, taken separately, which had value that was misappropriated by Defendants.  Rather, it is these characteristics together, and many more, which make Cole a walking, talking avatar of Hamilton.  (*See* Opp. at 12-15.)  And on summary

---

[11] Defendants are wrong when they claim that Hamilton does not dispute that the Pennsylvania common law right of publicity "require that his name have some discernible commercial value or other value that was appropriated by Defendants."  (Reply at 20.)  In fact, Hamilton disputes this.  (*See* Opp. at 29-30.)  As the court in *Fanelle* explained: "[b]ecause the majority of courts and solid reasoning favor the position that non-celebrities may bring an appropriate claim, I predict that the Supreme Court [of] Pennsylvania would, if confronted with this question, hold that celebrity status is not a *sine qua non* of a finding of liability in an appropriation claim."  *Fanelle v. LoJack Corp.*, C.A. No. 99-4292, 2000 WL 1801270, at *11 (E.D. Pa. Dec. 7, 2000).

judgment, this Court must infer indications of commercial value in the light most favorable to the nonmoving party. *See Smith v. Pitts. Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972).

It is also incorrect to say that Defendants did not obtain any benefits from using Hamilton's identity and likeness. (*See* Reply at 22.) In fact, the record is awash with evidence that Defendants reaped the benefits of Cole's popularity, so much so that they heavily featured him in advertisements to sell *Gears of War* games and *Xbox* game bundles, as well as devoted and sold entire game packs specifically devoted to Cole. (*See* SSMDF, ¶ 23 (entire game add-on devoted to Superstar Cole), ¶ 24 (Cole prominently featured in advertisements for *Gears of War* and *Xbox* game bundles), ¶ 25 (Defendants' witnesses acknowledging that Cole is a very popular character and a draw for *Gears of War* fans).) If a reasonable jury finds that Defendants misappropriated Hamilton's identity and likeness, they can certainly conclude that this was done to Defendants' benefit. Otherwise, why else would Defendants feature Cole so heavily in *Gears of War* advertisements and devote resources to developing game expansions specifically for him? *See Fanelle*, 2000 WL 1801270, at *11 (a reasonable jury could infer from the circumstances surrounding the misappropriation that it was used to defendant's benefit).

Finally, Defendants criticize another of Hamilton's experts, Dr. Barbara Luna, based on misrepresenting the record. (*See* Reply at 21-22.) Her expert disclosure is clear that she was not asked to *quantify* the commercial value of Hamilton's persona as her measure of damages did not require this, but she undertook to determine whether this value was more than *de minimis*. (*See* Ex. 17 at ¶ 46.) And contrary to Defendants' claims, this opinion was based on more than assumptions or allegations, but on reviewing underlying documents as well. (*See id.*)

### 3.      Defendants' Actual Knowledge of Misappropriation

Defendants set up another straw man argument by misconstruing Hamilton's position into one where Hamilton is arguing that "constructive knowledge" of misappropriation satisfies Section 8316's "actual knowledge" requirement.  *See* 42 Pa.C.S.A. § 8316(d).  But this is simply wrong.  Hamilton does not argue that Defendants *should have known* of their misappropriation, but that they *actually knew* based on a clear connection between Hamilton and Mr. Lester Speight and that the striking similarities between Cole and Hamilton can lead a reasonable juror to infer that this could not have been the product of anything but actual knowledge by Defendants.[12]  (*See* Opp. at 17-22.)

That *Washington v. Brown & Williamson Tobacco Corp.*, C.A. No. 82-0776, 1984 WL 63629 (E.D. Pa. Apr. 27, 1984), is more on-point than Defendants would like is evident by their half-hearted treatment of that case in a footnote.  (*See* Reply at 19 n.6.)  To be sure, *Washington* did not and could not address Section 8316 because the case predates the statute.  But the parallel between that case and the instant one is that both address information within an individual's mind.  In *Washington*, the issue was whether defendants intended to choose the plaintiff's photograph (*id.* at *2); here, it is whether Defendants knew that they were recreating Hamilton in the Cole character.  As *Washington* acknowledges, such information "is generally within that person's exclusive knowledge."  *Id.*  Like here, the defendants in *Washington* relied on their own witnesses' self-serving testimony stating that they had never seen the plaintiff prior to the misappropriation.  *Id.*  Defendants' attempt to distinguish *Washington* from this case because the plaintiff in *Washington* was well-known is unavailing because this fact does not necessarily

---

[12] Defendants do not seriously dispute that Mr. Speight lacked actual knowledge of Hamilton, but only the degree of his familiarity.  (Dkt. No. 116, ¶ 68.)

mean that the defendants themselves knew of the plaintiff—it only affects the likelihood.  In any event, Hamilton has presented ample evidence of his own repute (*see* Opp. at 15-17), which—when combined with Cole's striking resemblance to Hamilton—calls into question the testimony of Defendants' witnesses.  Like *Washington*, here "the inferences to be drawn from such facts are not questions for the court to resolve," and the jury should be given the opportunity to evaluate the credibility of Defendants' witnesses themselves.  *See Washington*, 1984 WL 63629, at *2 ("because the issue of intent is a material fact, the jury must be given an opportunity to observe the demeanor of [defendants' witnesses] to evaluate the credibility of each").

In another instance of misconstruction, Defendants oddly point out that copyright law does not impose a knowledge requirement for copyright infringement.  (Reply at 19-20.)  But it is unclear why that is relevant because Hamilton never drew a parallel between that aspect of copyright law and right of publicity; rather, the parallel that Hamilton drew was between what evidence is needed to show the accused infringer's access to the protected work (copyright) and the accused defendant's access to the misappropriated individual (right of publicity).  In any event, Defendants make no real effort to assail Hamilton's logic underlying the propriety of right of publicity law borrowing a concept from copyright law.  Indeed, there is ample precedent for one area of intellectual property law borrowing concepts from another.  *See Hart*, 717 F.3d at 158 (right of publicity law borrowing from copyright law); *see also Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 441-42 (1984) (copyright law borrowing from patent law).

Finally, try as they might, Defendants fail to resolve the conflicting testimony of Mr. Speight.  (Reply at 20.)  While Mr. Speight testified that he had no input into the Cole character (Statement of Material Disputed Facts ("SMDF"), Ex. 13 at 44:11-13), he also testified that he

18

tested different voices for Cole and suggested changes to the character's voice and that Cole's appearance morphed over time.  (*Id*. at 32:9 – 33:4; 44:14 - 45:2.)  It is clear from the record that Speight did have input into the appearance of Cole, and it is uncontested that Cole's appearance was changed after the Gears of War developers met Speight.  (*Id*. at 65:20 – 66:6.)  Defendants do not, because they cannot, dispute this fact.  Because Defendants fail to resolve the inconsistency of Speight's testimony, a jury should be allowed to determine Speight's credibility.

### C.     Unjust Enrichment Does Not Require a Contractual Relationship

 "The polestar of the unjust enrichment inquiry is whether the defendant has been unjustly enriched."  *See Reese v. Pook & Pook, LLC.*, 158 F. Supp. 3d 271, 301 (E.D. Pa. 2016) (quoting *Limbach v. City of Phila.*, 905 A.2d 567, 577 (Pa. Commw. 2006)).  Further, "[i]n order to recover, there must be *both* (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied."  *Id.* (quoting *Samuels v. Hendricks*, 445 A.2d 1273, 1275 (Pa. Super. Ct. 1982) (emphasis in original)).  "[I]f unjust enrichment is demonstrated, the law will imply a contract to provide value for the benefit conferred."  *Kligman v. Advanced Polymer Sys., Inc.*, No. CIV. A. 00-580, 2001 WL 1173998, at *9 (E.D. Pa. Oct. 2, 2001); *see also Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. 1999) ("Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred").

Therefore, Defendants' reliance on the lack of *existing* contractual or quasi-contractual agreement between the parties is misplaced.  In *Reese*, plaintiff toy collectors successfully stated a claim of unjust enrichment against defendant auction pricing experts where, although no contract, implied contract, or fiduciary duty existed between the plaintiffs and the auction experts, the defendants "received a benefit" by manipulating the market in which the plaintiffs sought to sell their products.  158 F. Supp. 3d 271 at 300.  Plaintiffs claimed that they "conferred

upon Defendants economic opportunity and actual economic benefit, in the nature of profits resulting from unlawful auction practices and other conduct . . . to the economic detriment of Plaintiffs." *Id.* Similarly, Defendants here have exploited Hamilton's likeness and have profited handsomely from such exploitation to Hamilton's detriment, and allowing Defendants to retain that wrongfully secured benefit would be "unconscionable." *Id.* at 301.

## III.    CONCLUSION

For the foregoing reasons and those in the Opposition Brief, Hamilton respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.

Dated: April 8, 2019

*Respectfully submitted,*

  */s/ Benjamin E. Gordon*
Joe N. Nguyen (Pa. ID No. 93638)
Benjamin E. Gordon (Pa. ID No. 311741)
STRADLEY RONON STEVENS & YOUNG, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
T: (215) 564-8000
F: (215) 564-8120
E: JNguyen@Stradley.com;
    BGordon@Stradley.com

 - and -

John M. Pierce (*admitted pro hac vice*)
PIERCE BAINBRIDGE BECK
PRICE & HECHT LLP
600 Wilshire Boulevard, Suite 500
T: (213) 262-9333
E: jpierce@piercebainbridge.com

 - and -

Carolynn G. Beck (admitted *pro hac vice*)
PIERCE BAINBRIDGE BECK
PRICE & HECHT LLP
One Thomas Circle NW, Suite 700
Washington, DC 20005
T: (213) 262-9333

20

E: cbeck@piercebainbridge.com

 - and -

Maxim Price (admitted *pro hac vice*)
David L. Hecht (admitted *pro hac vice*)
Patrick Bradford (admitted *pro hac vice*)
Yi Wen Wu (admitted *pro hac vice*)
PIERCE BAINBRIDGE
BECK PRICE & HECHT LLP
20 West 23rd St., 5th Floor
New York, NY 10010
T:  (212) 484-9866
E:  mprice@piercebainbridge.com;
dhecht@piercebainbridge.com;
pbradford@piercebainbridge.com;
wwu@piercebainbridge.com

*Counsel for Plaintiff Lenwood Hamilton*